516 So.2d 1246 (1987)
Mary Jeanette McGREW, Appellant,
v.
James E. JORDAN, Jr., John R. McGrew, & Bituminous Fire and Marine Ins. Co., Appellees.
No. 19153-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1987.
Gordon & Bailey, by Jack M. Bailey, Jr., Shreveport, for appellant.
*1247 Bodenheimer, Jones, Klotz & Simmons, by G.M. Bodenheimer, Hicks & Bookter, by S. Maurice Hicks, Jr., Shreveport, for appellees.
Before HALL, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
This is a suit for personal injuries resulting from an auto accident. The plaintiff, Mrs. McGrew, was injured when the truck in which she was a passenger ran off the road and hit a telephone pole. After a bench trial, she was awarded medical damages of $650 and general damages of $5,000. Mrs. McGrew now appeals, claiming this award is inadequate. For the reasons expressed, we amend and affirm.
The accident occurred on June 7, 1983. The plaintiff's husband, Mr. McGrew, was driving his Chevy S-10 pickup north on Hearne Rd. in the right (curb) lane. Mrs. McGrew was riding on the passenger side. James Jordan, a defendant, was driving a larger Chevy pickup north on Hearne in the left lane and was running almost side-by-side with Mr. McGrew. As they approached the intersection with Malcolm Dr., someone in Jordan's lane slowed or stopped to make a left turn. Jordan veered to the right and may have made contact with the front of Mr. McGrew's truck. Without slowing down, Mr. McGrew veered to his right, struck the curb, lost control and skidded into a telephone pole, allegedly causing the injuries of which Mrs. McGrew now complains. He estimated his speed at 45 m.p.h. before he lost control.
The trial court assessed fault of 65% to Jordan, his employer and their insurer, and 35% to Mr. McGrew and his insurer. The precise facts of the accident and the allocation of fault have not been appealed. Rather, the only issue is causation: whether Mrs. McGrew's substantial difficulties resulted from this accident or were merely the extension of her debilitated pre-accident condition. The trial court gave neither oral nor written reasons for judgment but apparently concluded that the accident did not appreciably aggravate the plaintiff's condition and was not responsible for any of the numerous surgeries she underwent after the accident. As noted, the court awarded only $5,650 in total damages. We conclude that the trial court was not clearly wrong in its implicit finding that the accident did not cause the long-term health problems from which Mrs. McGrew now suffers. However, we also conclude that the overwhelming evidence of her frailty and susceptibility to pain proves the award inadequate for the acute stage of the injury. We will amend the judgment accordingly.
Mrs. McGrew's prior medical history
Mrs. McGrew, who was 47 years old at the time of trial, was raised on a farm and spent most her early life engaged in heavy farm labor. With the exception of a childhood sprain that resolved itself, she experienced no back problems through the early years of raising small children and working on the farm and at odd jobs until she hurt herself checking groceries at a Piggly Wiggly in November 1968. What started then as low back pain increased into numbness running down her legs. A myelogram showed nerve root problems at L-4, 5 on the left side; she eventually underwent her first surgery, a partial hemilaminectomy at L-4 and L-5 in February 1969. This operation gave her considerable relief for a few months, but in May 1969 the back pain recurred at the same lumbar level. She spent some time wearing a back brace and taking medications, notably Indocin, and the condition seemed to improve. Then in August 1969 the symptoms recurred with such severity that Mrs. McGrew could not work. She was once again fitted in a brace. By October 1969, Dr. William Fox discharged her with a 15-20% partial permanent disability. Mrs. McGrew testified that after she recovered, she went back to work at Piggly Wiggly for about a year; Dr. Fox testified he did not know about this, although he thought she "should" be able to return to work as a grocery store checker.
Mrs. McGrew's next complications arose in August 1971 when the car in which she was riding was hit by a furniture truck, causing a sprain of the lumbar spine. After conservative treatment and drugs such *1248 as Darvon and Parafon Forte failed, she was hospitalized for a myelogram which showed a large defect at L-4 on the left side. She therefore underwent a second surgery to remove the L-4 disc. In November 1971 she reported no pain but a tingling sensation in her feet; by January 1972, the symptoms had recurred. A regimen of drugs, including Phenaphen # 3 (acetaminophen with codeine) produced moderate improvement, but left her with a limp in the left leg. Dr. Fox diagnosed irritation and damage to the L-5 nerve root and L-4 disc and prescribed Indocin and Talwin for pain. His last notation, in May 1971, reported her doing "a little better." Mrs. McGrew subsequently went to Dr. Young for surgery to relieve a pinched nerve that occurred in the course of healing from one of the disc surgeries. Around this time, Mr. McGrew went into business for himself, starting John McGrew Construction Co. and renting spaces in a trailer park. Mrs. McGrew testified that despite her pain and partial disability, she was able to assist him with office work and still keep up with household chores.
For the next few years, Mrs. McGrew did not experience any problems with her back; she testified that she settled with the driver of the furniture truck for her medical expenses plus "a bit." She underwent unrelated surgeries in 1976 and 1979. She went to Commercial College, graduated in 1978, and went to work for Shreveport Refrigeration in accounts receivable. She then transferred to SR's sister company, Five Star Distributing Co., as a receiving clerk. In this capacity she sometimes moved equipment. On one occasion she was moving a box and experienced sudden, severe pain in the back. She went to Dr. Fox's associate, Dr. Albert E. Dean.
When Dr. Dean saw her in June 1980, he suspected a spinal stenosis (crowding of the spinal cord) or a recurrent lumbar disc. He admitted her to Schumpert in August, where she had a myelogram and underwent a laminectomy of the L-4 to the sacral area, with excision of the L-5/S-1 disc on the right. Despite satisfactory healing, she continued to experience burning pain. In October, Dr. Dean noted degenerative changes in the cervical spine. In December, she turned and twisted her back again. She complained that she could not do housework then.
Because this pain would not abate, Dr. Dean hospitalized her in March 1981 for another myelogram and CT scan. On March 26 she underwent surgery of the L-3 disc and an expiration of the L-2 area. After the surgery, Mrs. McGrew improved and Dr. Dean thought she might return to work, but she was still bothered by persistent pain. When these problems had not abated by September 1981, Dr. Dean concluded that her lumbar pain was due to degenerative changes, secondary to her previous back problems; he thought she had reached a maximum cure, was at the chronic stage and would not be able to work again. Despite having "good days," Mrs. McGrew had to rest two hours every day and could not ride long distances in a car without pain. She continued to see Dr. Dean regularly into 1982, always complaining of pain. In April 1982 he reiterated that she had "definite further disability" of her back, there would be no further improvement, and that she would not be able to work again.
In July 1982, Mrs. McGrew settled a workers compensation claim with Shreveport Refrigeration, in which she contended she was permanently and totally disabled. She received a lump sum of $62,500 in settlement of the claim, and medicals for both surgeries, as well as an agreement by the insurer to pay medical bills connected with her back condition for two years from the date of the settlement, provided she was treated by Dr. Dean. In addition, Mrs. McGrew applied for and received Social Security disability benefits.
In July 1982, Mrs. McGrew also began experiencing problems with her right hand. She went to the emergency room for this, but also complained about pain in her neck. Dr. Dean testified that she was suffering from the same degenerative back condition, which was exacerbated at the time by coughing associated with a cold.
*1249 In August 1982 she returned to Dr. Dean with continued back problems and with increased difficulties in her right hand. Dr. Dean felt the hand problem was due to degenerative arthritic changes; the back problem was due to degenerative disc disease of the lumbar spine, secondary to her previous surgeries. He gave her medication, including Tylenol 3 (a mild narcotic) for pain. The back pain, with substantial leg pain, was still bad in September, so Dr. Dean confined her to bed rest. In October she returned to the hospital for another CT scan, which showed protrusion of the L-3/L-4 disc; Dr. Dean thought this could be scar tissue or it could be a disc. He diagnosed residual back pain anxiety, secondary to previous probable adhesions, and maybe a slight protrusion of the L-3 disc. Later in October she still complained of back and leg pain, with a burning sensation in her toes; in November it was worse, leading Dr. Dean to suspect an early cervical disc. In late December 1982, her chief complaint was pain in the right arm and neck, in addition to back problems. She went to Schumpert for another myelogram, which showed a postinter defect at L-3, but the cervical part was normal; Dr. Dean concluded that this problem was a thoracic outlet syndrome in addition to degenerative changes of her back.
In April 1983, she was complaining of more pains in the neck, down the arm, in the back and down the legs, all of which had been "rather severe" lately. Dr. Dean gave her a number of medicines, including Sinequan, an antidepressant, and advised her to continue with Tylenol 3. In May she was still complaining of pain. She confirmed that another physician, Dr. Gaddis, had diagnosed carpal tunnel syndrome as the cause of the pain in her right hand.
Mrs. McGrew testified that throughout this time before the accident, she was basically mobile and able to handle the routine activities of doing the laundry, caring for her grandchildren and mowing the yard. She admitted that after each operation she would be bedridden for a while but that after sufficient recuperation she was always able to resume her schedule with some "help" from family members; she could always manage the pain. She claimed that she had intended to return to bookkeeping and office work for her husband's company, R.p. 466, although Mr. McGrew was not totally convinced. R.p. 581, 601-602.
Dr. Dean, who treated her regularly until the time of the accident, had a different assessment of her condition. He characterized her as "fragile" and summarized:
She had a chronic problem with her lumbar region, lumbar spine. She was having difficulties with her neck, cervical spine. She possibly had a carpal tunnel syndrome, pressure on the median nerve in this right wrist, or the thoracic outlet syndrome, which is the pressure on the nerve after it comes out of the neck. She was disabled. She was unable to work at that time. R.p. 245.
The accident and subsequent problems
The accident, occurring on June 7, 1983, came not quite a month after Dr. Dean's assessment. Mr. McGrew estimated his speed at 45 m.p.h. when he struck the curb and lost control. He ran solidly into a telephone pole, as evidenced by the photographs of the wrecked truck, P-16 and P-17, and at a force that Dr. Moss estimated at 16 to 20.6 gs. R.p.p. 529-530.
Before impact, Mrs. McGrew threw up her arms to brace herself. When the truck hit the pole, her head struck and cracked the front windshield. She sustained minor cuts along the hairline and on her hands. Then, in the backlash, her head struck and broke the rear window of the truck. She was bleeding from her nose and mouth, had sudden pain in her legs and back, and numerous bruises. She was never totally unconscious but her recollection of the next events was somewhat hazy. She was taken by ambulance to Willis-Knighton Hospital. She had pain in the face, in her legs and stomach that she had never had before. She also had pains in the lower back and upper chest. She was transferred to South Park Hospital, where Dr. Moufarrej suspected a nasal fracture. She was given Dilaudid, a narcotic drug, for pain. She was in the hospital until June 10; she was *1250 discharged but still in pain. Three days later she returned to South Park, complaining of severe and unprecedented pain in the chest and upper back area; she was also still suffering in her legs and lower back. She complained that her wrist was much worse now. She remained in the hospital until June 18. She was found to have no fractures in the ribs or nose, and no contusions of the lungs; she had bruises to the left upper anterior chest wall. Following her discharge, Mrs. McGrew made weekly visits to Summer Grove Clinic. Her principal treating physician at South Park and at the Clinic was Dr. Leopard. Neither he nor Dr. Moufarrej testified about Mrs. McGrew's medical condition.
In July 1983, Mrs. McGrew returned to Dr. Dean with continued pain in the back and legs; in August she lodged the same complaints. On September 16, she complained of pain in the right arm and neck. An X-ray showed some obliteration at C-5, C-6, so she was sent to the hospital for additional tests. The myelogram showed surgical scars in the lumbar area but a normal cervical area. The EMG showed carpal tunnel syndrome in the right wrist. In late September she was re-admitted for surgery on her wrist; within a month the wrist was doing very well. Her back, however, continued to be a problem. She had pain running from the lower back to the right leg. Dr. Dean X-rayed her and diagnosed degenerative disc disease not only of the L-4, 5 and L-5/S-1 discs but also of the L-2, L-3 and L-4 discs. He described her condition as "severe" and confined her to bedrest. She was hospitalized in late January and early February 1984 for back pain; she was given morphine, then Darvocet and Sinequan, which helped. The EMG indicated chronic changes in the nerves, while the CT scan showed an L-3 defect consistent with scarring from the prior operation.
Later in February, Dr. Dean performed another surgery consisting of a laminectomy at L-3/L-4, further decompression removing bone lamina, removal of an extruded L-3/L-4 disc, and decompression in a posterolateral fusion from L-3 to the sacrum. Mrs. McGrew did well after this operation, but by August 1984 she was complaining once again, and Dr. Dean attributed her pain to degenerative changes in the L-2 and L-3 area. Mrs. McGrew stopped going to Dr. Dean in August 1984, which is roughly when the visits ceased being covered by the insurance settlement with Shreveport Refrigeration.[1]
Meanwhile Mrs. McGrew began to seek other medical opinions. In January 1984, she went to a rheumatologist, Dr. Larry Broadwell, for pain in her hands and shoulders. He diagnosed osteoarthritis in the hands, degenerative disc disease of the hands, and lumbar disc disease. In early 1985, he also diagnosed fibrositis, a chronic disease that can take months or years to develop. Since then, Dr. Broadwell has treated her fairly consistently with muscle relaxants, sleep medication, anxiety medication, anti-inflammatory medication and exercise. The condition will never go away.
In January 1985, Mrs. McGrew went to Dr. M. Ragan Green, an orthopedic surgeon. He treated her for back, neck and elbow pain, and hospitalized her in October 1985 for her neck. His diagnosis was chronic pain secondary to back problems primarily, which comprises degenerative joint disc disease of the lumbar spine; failed back syndrome; and multiple surgical procedures. R.p. 375. He testified that Mrs. McGrew can be treated by rehabilitation.
On referral of her attorney, Mrs. McGrew began seeing Dr. Joe B. Hayes, a psychiatrist, in early 1985. She related to him her medical history and expressed frustration that after several operations that helped her, this accident had left her unable to lead a normal life. Dr. Hayes diagnosed "mild to moderate" post traumatic stress disorder, chronic pain syndrome and a significant amount of post traumatic depression. Mrs. McGrew testifed she was unable to cope with her pain, unable to sleep at night, and was somewhat withdrawn from her family and friends. *1251 Between the accident and the time of trial, she had been hospitalized 14 times, excluding outpatient treatments.
Discussion
Mrs. McGrew contends that all her medical difficulties after the accident resulted from the accident. The defendants claim she did not prove by a preponderance of evidence that the accident has left her in appreciably worse health than she was in before. The tortfeasor takes the victim as he finds her and is responsible in damages for consequences of his tort, even though the damages are greater because of the victim's prior condition. Reck v. Stevens, 373 So.2d 498, 14 A.L.R. 4th 313 (La.1979); Sepulvado v. Willis-Knighton Med. Center, 459 So.2d 152 (La. App.2d Cir.1984), writ denied 462 So.2d 197 (La.1984). However, the plaintiff has the burden of proving both her injuries and a causal connection between the injuries and the tort, by a preponderance of evidence. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); McSweeney v. DOTD, 442 So.2d 659 (La.App. 1st Cir.1983). When the defendant's negligent act aggravates a pre-existing condition or injury, the victim is entitled to compensation for the full extent of aggravation. Perniciaro v. Brinch, 384 So.2d 392 (La.1980). A causal link between the negligent act and the degree of aggravation must be established. Harrigan v. Freeman, 498 So.2d 58 (La. App. 1st Cir.1986).
The principal evidence that Mrs. McGrew asserted in support of her claim was her own testimony and that of her family members. The family members' testimony tended to corroborate that she was mobile before the accident. For example, her son John testified that before the accident, she could mow the yard and keep a garden without any help and drive around with no problems. R.p. 218. However, another son, Ricky, testified that mowing or gardening would leave her fatigued and necessitate some rest. R.p. 326-27. Mrs. McGrew admitted that she could not do any work involving lifting, bending or sitting all day, and that even the office work for her husband presented some "problems." R.p. 464, 467. The witnesses also corroborated that Mrs. McGrew has been less active since the accident, though not completely invalid. See, e.g., R.p.p. 328-330.
Mrs. McGrew's physicians, however, were not as convinced that the June 7 accident worsened the condition of her back in the long run. Especially important is the opinion of Dr. Dean, who treated her both before and after the accident. As her treating physician, his opinion is entitled to great weight. Welborn v. Ashy Enter., 478 So.2d 626 (La.App.2d Cir.1985), writ denied 481 So.2d 1333 (La.1986). Before the accident, he concluded that she had chronic problems and degenerative changes of the spine. Six months after the accident, Dr. Dean still believed her problem was degenerative disc disease of the L-4/L-5 and L-5/S-1 discs. R.p. 251. When asked on direct examination whether the trauma would have probably accelerated the degenerative process, he replied, "not necessarily." R.p. 246. He explained that "usually" a trauma aggravated a pre-existing degenerative condition, but that the condition usually returned to its previous status, and that "there would be no way to tell." By a letter of January 13, 1984, Dr. Dean told Mrs. McGrew's counsel that he did not diagnose any ruptured disc from the accident but that she "probably had some aggravation of her previous injuries." R.p. 260. At trial, he explained that the accident probably aggravated the condition "for a period of time," maybe six or eight weeks, until the sprain resolved itself. R.p. 261. He refused to comment any further on the degree or duration of the aggravation. R.p. 260.
Dr. Fox, who had treated Mrs. McGrew's back for years and was quite familiar with her general state of health, testified that without "strong findings of some sort," he could not say whether the accident aggravated her condition. R.p. 418. While expressing that she "definitely" suffered trauma from the wreck, he said the accident possibly, but not highly probably, would have caused her condition to change from asymptomatic to symptomatic. R.p.p. 421, 422. He stated he would defer to Dr. Dean's evaluation, adding that a slight aggravation *1252 would usually resolve itself in four to six weeks. R.p.p. 422, 423.
Dr. Broadwell, who was called in several months after the accident, diagnosed fibrositis as Mrs. McGrew's current problem. Fibrositis, which usually takes months or years to develop, does not cause actual physical damage; Dr. Broadwell admitted that it is a "controversial" diagnosis among physicians. R.p. 363. It is an ailment of insidious onset, arising mostly in middle-aged women who show a cycle of muscle tension and pain, disturbance of deep sleep, and physical and emotional stress. R.p. 352. He explained that the condition of Mrs. McGrew's soft muscle tissues, after surgeries and numerous accidents, predisposed her to the condition. He testified that the accident of June 1983 could have contributed to it, but he would not say the accident aggravated it. R.p. 361. He stated he would defer to Dr. Dean's evaluation, and he would not disagree with the 1979 diagnosis of osteoarthritis. R.p. 367.
Dr. Green saw Mrs. McGrew over a year after the accident. He diagnosed cervical myositis and degenerative joint disc disease of the lumbar spine, and stated that the accident "can very much cause aggravation." R.p. 383. However, he did not know whether it affected her condition. R.p. 378. He stated he would defer to Dr. Dean's evaluation. R.p. 383. He also stated that he did not think Mrs. McGrew's carpal tunnel syndrome was related to the accident. R.p. 377.
Finally, Dr. Hayes treated her for various emotional and stress-related problems. He considered her a credible patient, but testified that her past surgical history, accumulated pain and diagnosis of osteoarthritis would have made her nervous or depressed. R.p.p. 275, 280. We would note that in April 1983, before the accident, Dr. Dean had already prescribed an antidepressant for use at night, Sinequan. R.p. 244. Dr. Hayes gave her Elavil. R.p. 268.
Viewing this evidence as a whole, we concede the issue of the degree of aggravation is a close one. Mrs. McGrew and her family were uniform in saying that she has been worse off after the accident. Drs. Dean and Fox, however, were peculiarly unwilling to say that the accident was, more probably than not, the major cause of the pain and discomfort she experienced after the accident. Their evidence that she suffered from osteoarthritis would be consistent with the worsening and general decline of health she has experienced over the years. Given this state of the evidence, we cannot say the trial court was clearly wrong in failing to find a long-term aggravation of Mrs. McGrew's chronic back condition. Baughman v. Aetna Cas. & Sur. Co., 302 So.2d 312 (La.App. 1st Cir.1974); Fleming v. State Dept. of Hosp., 308 So.2d 366 (La.App. 1st Cir.1975), writ denied 313 So.2d 238 (La.1975); see also Frey v. Alfred, 492 So.2d 48 (La.App. 1st Cir.1986).
Notwithstanding the trial court's holding as to aggravation of Mrs. McGrew's chronic problem, the evidence concerning the accident and impact show that she suffered an acute trauma, and even though none of the physicians who treated her immediately after the accident testified, the overwhelming evidence of the fragile condition of her back clearly undermines the award of $5,000 to the extent of abuse of discretion. The tortfeasor takes the victim as he finds her. Reck v. Stevens, supra; Sansonni v. Jefferson Par. Sch. Bd., 344 So.2d 42 (La.App. 4th Cir. 1977), writ denied 346 So.2d 209 (La.1977); Rachal v. Bankers and Shippers Ins. Co., 146 So.2d 426 (La.App.3d Cir.1962), writ denied (not reported). An award of $5,000 might adequately compensate a reasonably healthy person who sustained a mild to moderate cervical and lumbar sprain. See, e.g., Labee v. Coca Cola Bottling Co., 500 So.2d 850 (La.App. 1st Cir.1986); Johnson v. Carter, 430 So.2d 1163 (La.App. 1st Cir. 1983); Guillory v. Agee, 465 So.2d 222 (La.App. 3d Cir.1985). But it strains credibility to hold that a person of Mrs. McGrew's state of health could weather the trauma so easily. With her delicate back and its proneness to pain, she obviously fared worse than a healthy person. See, e.g., Spears v. Aguilar, 436 So.2d 672 (La. App. 4th Cir.1983); Delaney v. Empire Ins. Co., 469 So.2d 1173 (La.App.3d Cir. *1253 1985); Bruce v. Williams, 516 So.2d 1183 (La.App.2d Cir.1987); cf. Boudreaux v. Terrebonne Par. Police Jury, 477 So.2d 1235 (La.App. 1st Cir.1985). In addition, she sustained two solid blows to the head, cuts around her face and serious contusions over much of her body. The appropriate measure of damages is governed by the facts and circumstances of the particular case. Dupree v. La. Transit Management, 441 So.2d 436 (La.App.2d Cir.1983), writ denied 445 So.2d 1233 (La.1984). Bearing this in mind, we feel that the least possible award that could justifiably compensate Mrs. McGrew would be $15,000, and we will enter judgment accordingly.
As for medicals, Dr. Dean testified that Mrs. McGrew's cervical and lumbar sprain should have resolved itself within six to eight weeks. This roughly corresponds to the time when the carpal tunnel syndrome, which predated the accident, arose as her most pressing medical problem. Mrs. McGrew is therefore entitled to medical, hospital and drug expenses until September 9, 1983, for a total of $3,780.50.
For the reasons expressed, the judgment is hereby amended to read as follows:
That there be judgment in favor of MARY JEANETTE McGREW and against the defendants in the percentages indicated below jointly, severally and in solido in the sum of Eighteen Thousand, Seven Hundred Eighty and 50/100 ($18,780.50) Dollars, consisting of Fifteen Thousand and No/100 ($15,000.00) Dollars general damages and Three Thousand, Seven Hundred Eighty and 50/100 ($3,780.50) Dollars in medical bills.
The judgment is otherwise affirmed. Costs of appeal are assessed to appellees in the same proportion as the costs in the trial court.
AMENDED AND AFFIRMED.
NOTES
[1] Mrs. McGrew saw Dr. Dean in November 1984 for a bunion on her foot.