555 So.2d 664 (1989)
Raymond DAVIS, Jerry Lewis, Maurice Hall and Anthony Alexander
v.
SEWERAGE AND WATER BOARD OF NEW ORLEANS.
No. 89-CA-0388.
Court of Appeal of Louisiana, Fourth Circuit.
December 29, 1989.
Writ Denied March 30, 1990.
*665 Patrick G. Kehoe, Jr., Birdsall, Rodriguez, Robelot, New Orleans, for plaintiff/appellee.
Harold D. Marchand, Sewerage and Water Bd. of New Orleans, New Orleans.
Before BARRY, BYRNES and PLOTKIN, JJ.
BARRY, Judge.
The only issue is the amount of personal injury damages awarded against the Sewerage and Water Board of New Orleans.
On January 27, 1987 at about 7:00 p.m. a car driven by Anthony Alexander and occupied by Maurice Hall, Raymond Davis and Jerry Lewis went into a three feet by eight feet hole in the 1300 block of Mandeville Street. The Board had dug the hole in order to repair a sewer line, but the backfill had eroded.
After a bench trial the court found that the accident was caused solely by the Water Board and awarded Raymond Davis $3,000 general damages and $325 medical expenses; Jerry Lewis $3,500 general damages and $1,020 medical expenses. Anthony Alexander was awarded general damages of $100,000, lost earning capacity $50,000, past medical expenses $16,361, lost wages $4,020, a total of $170,381. Maurice Hall was awarded general damages of $225,000, lost earning capacity $75,000, past medical expenses $18,272, future medical expenses $15,000, lost wages $13,199, a total of $346,471.
The Water Board appealed the awards as excessive, but made no arguments specifically as to Lewis and Davis. Davis, Lewis, Alexander, and Hall answered and asked for increases in their awards. However, *666 their brief does not argue as to Lewis' award. The brief argues the trial court abused its discretion: by awarding Alexander $100,000 general damages instead of $175,000, $50,000 for loss of future earning capacity instead of $184,874, and failing to award future medical expenses of $23,100; by awarding Hall $225,000 for general damages instead of $300,000, $13,199 in past lost wages instead of $13,235, $75,000 for loss of future earning capacity instead of $238,113, and $15,000 for future medical expenses instead of $99,512; by awarding $325 to Davis for medical expenses whereas $825 was incurred.
THE LAW
A trial court has much discretion in assessing damages. La.C.C. art. 2324.1 (pre-1984 art. 1934(3)). A reviewing court should not disturb a trial court's award absent an abuse of discretion. Because a trial judge has closer contact with the injured parties, he is better able to decide the actual loss. Sherlock v. Berry, 487 So.2d 555 (La.App. 4th Cir.1986), writ not considered 489 So.2d 912 (La.1986).
An appellate court must first analyze the facts and circumstances peculiar to an individual case and determine that there has been an abuse of the trial court's "much" discretion in awarding damages. If the award is excessive or insufficient an appellate court may examine comparable cases for guidance to determine an appropriate award. Reck v. Stevens, 373 So.2d 498 (La.1979); Redondo v. Consolidated Freightways Corp. of Delaware, 529 So.2d 1296 (La. 4th Cir.), writ denied 533 So.2d 363 (1988); Fitzgerald v. Gulf International Cinema Corporation, 489 So.2d 306 (La.App. 4th Cir.1986). An appellate court can only raise or lower the award to the highest or lowest point which was within the lower court's discretion. Coco v. Winston Industries, 341 So.2d 332 (La.1976).

ALEXANDER'S AWARD
Dr. Bogran, general surgeon, testified he first saw Alexander two days after the accident. Alexander had a laceration of the lower lip and broken incisor. Alexander complained of back pain radiating down his right thigh. Dr. Bogran observed positive straight leg raising and back muscle spasms. Dr. Bogran told Alexander not to work or lift and prescribed conservative treatment. A subsequent CAT scan showed a herniated L5-S1 disk and Dr. Bogran referred Alexander to Dr. Vogel.
Dr. Vogel, neurosurgeon, testified he examined Alexander on April 21, 1987 and found an acute lumbosacral strain with a possible herniated disk. He reviewed the CAT scan which showed a midline bulge at L4 and L5-S1. Alexander was hospitalized June 28, 1987 and underwent further testing which showed a herniated disk at L5-S1 level. Dr. Vogel removed part of the disk which was compressing the nerve root. Six weeks later Alexander still had mild low back and right leg pain and mild persistent muscle spasm. Six weeks later he had mild low back pain with intermittent right leg pain.
Dr. Vogel estimated Alexander had a 10-15% permanent partial total body medical impairment. He advised against bending repeatedly at work. Dr. Vogel permanently prohibited lifting, pushing, or pulling more than fifty pounds. Dr. Vogel saw Alexander on February 23, 1988 and May 10, 1988. Dr. Vogel used a sacral epidural block, an analgesic and cortisone injection, to diminish lumbosacral irritation. He last saw Alexander on June 23, 1988 when he still had muscle spasms and low back and right leg pain although he was continuing to work.
Dr. Vogel reviewed a May 2, 1988 MRI (magnetic reasonance imaging) which indicated a normal L3 and L4 disk with mild degeneration plus a minimum bulge at L5-S1 level where Dr. Vogel had operated. Dr. Vogel recommended continued conservative treatment and another epidural block. Alexander would reach 80-90% relief of pain, but would require medical treatment three or four times a year for the rest of his life, and maybe one or two courses of physical therapy yearly.
Dr. Vogel felt Alexander could maintain gainful employment within his restrictions but would experience episodes of discomfort. *667 If his employment caused him to lift more than fifty pounds, he would experience flare-ups and the possibility of a lumbar fusion in the future. Dr. Vogel attributed the herniated disk to the accident. Maximum improvement would occur about one year after surgery and Alexander would have pain the rest of his life.
Dr. Kewalramani, orthopedic surgeon, testified that he evaluated Alexander on January 4, 1988 (incorrectly transcribed as 1986) as having chronic lumbar musculoligamentous pain syndrome in the lumbar L4-5 and S1 area. Alexander complained of pain and an electromyography indicated an abnormality compatible with a right L5 radiculopathy (spinal nerve root disease). The EMG showed a change in the L5 nerve root probably caused by a spur pinching the nerve or by the presence of a disk bulge.
Although Alexander was working, Dr. Kewalramani permanently recommended that he was not to lift more than 50 pounds occasionally and 35 pounds on a regular basis and to avoid bending and stooping. A CAT scan and MRI confirmed EMG and thermography abnormalities. Dr. Kewalramani encouraged home therapy, exercises for the abdominal muscles, medication and a doctor's supervision and care. He concluded Alexander could possibly avoid future surgery if he did not bend and lift beyond his limits. Dr. Kewalramani stated Alexander would have pain the rest of his life with a 15-20% anatomical disability. A pain clinic would be helpful. If he did heavy lifting, Alexander might require surgery to remove the disk.
Dr. Richard Levy, neurosurgeon, testified he saw Alexander once on June 24, 1988. He complained of low back and right leg pain. Alexander told Dr. Levy he returned to work in September, 1987 but missed two to three months during a nine month period. After reviewing reports and x-rays and conducting a neurological exam, Dr. Levy concluded that Alexander had disk material removed at L5-S1 and had a 5-10% permanent partial anatomical disability of the body. He did not attribute Alexander's back pain to the automobile accident as a whole because complaints did not occur within 72 hours of the accident.
Dr. Levy felt Alexander could continue work as a shipping clerk but he should not lift more than forty to fifty pounds and should not repeatedly bend, stoop or climb. Dr. Levy found no objective back signs, even though Alexander had a problem bending and experienced tenderness at the L5-S1 level. The doctor felt numbness was due to residual compression, not nerve root involvement or radiculopathy at L5.
Jennifer Palmer, vocational rehabitational counselor, testified that she reviewed medical information and recommended that Alexander continue to work as a shipping and receiving clerk even though that job was classified as medium work. She said if the doctors recommended that Alexander quit his job, he would be at a disadvantage in the job market due to his limited education.
Susan Smith, occupational therapist, determined Alexander's functional capacity. She considered his medical problems, restrictions, and lifestyle. A high school graduate, he worked as a shipping clerk which is classified as medium work. Her tests determined Alexander could lift 15 to 20 pounds occasionally, but overhead lifting should be limited to 5 pounds. He could not do repetitive bending, pushing and pulling, nor stand or sit for long periods. She felt he could do light work (lifting 10 pounds) or semi-sedentary work, should quit his job, and perhaps get training. Her recommendation was to refer him to a vocational rehabilitation agency.
Henry LaRoche, personnel consultant, saw Alexander on April 25, 1988. He referred to Susan Smith's report and stated Alexander could not do normal labor or physical jobs and would have to be retrained. He could not sit for long periods which would limit clerical positions. He said Alexander could do light work but with his medical history would be at a disadvantage in the job market.
Alexander testified he had pain down his right leg after the accident. He went back to work as a shipping clerk at B. Bennett & Company, but the work was painful and he *668 could not do all his duties. He worked in pain in order to support his family. He continued to have back and leg pain even after his surgery. He was still working in pain. Russell Wilson, his co-worker, said the boxes they lift weigh from 30 to 135 pounds. He testified that Alexander had a very good reputation at work, but had missed a lot of work time due to medical appointments.
Dr. Melville Wolfson, forensic economist, testified that Alexander lost $4,160 in past wages until the trial date. Using a life expectancy of 34 years and 24 years until retirement, Dr. Wolfson calculated future loss of wages at $184,874 using Alexander's 1987 W-2 form and a $5.00 hourly rate. If Alexander earned minimum wage in the future, the loss would be $51,277.
Dr. Kenneth Boudreaux, a defense expert in consulting economics, did an income analysis using the average of Alexander's 1986 and 1987 wages. He made his calculations on a 21.02 per year life expectancy (Bureau of Labor Statistics) and assumed that Alexander would return to work at minimum wage and his loss would be $1,953 and $3,223 a year. He calculated past lost wages to be $8,000.
The trial court's reasons for judgment note that Alexander (age 37) sustained a ruptured lumbar disk as a result of the accident, had undergone a lumbar disketomy, and returned to work in ten weeks. The court pointed out that recent tests showed a nerve root irritation and Dr. Vogel felt Alexander had a 10-15% permanent partial disability of the body as a whole. The court awarded $100,000 for general damages.
Recompense for pain and suffering cannot be calculated with precision. Walton v. William Wolf Baking Company, 406 So.2d 168 (La.1981), quoting Boutte v. Hargrove, 290 So.2d 319, 322 (La.1974). Considering the partial disk removal, possible future surgery, and painful nature of the injury, we conclude the trial court did not abuse its much discretion. Although Alexander argues that the award is an abuse of discretion, we find no abuse of discretion.
As to Alexander's loss of earning capacity, the court found that the injuries diminished his ability to earn income. The court accepted Susan Smith's recommendation for vocational rehabilitation and noted the medical evidence showed that if Alexander continued his present job, his condition would likely deteriorate. The court awarded $50,000 for future loss of earning capacity, plus medical expenses of $16,361 and lost wages of $4,020.
We do not find merit in the Water Board's argument that Alexander did not prove loss of future earnings with reasonable certainty. Loss of future earnings encompasses loss of earning potential; it is not predicated on the difference between his earnings before and after an injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Deference to the trial court is particularly appropriate as to loss of future wages because such awards are speculative and cannot be fixed with mathematical precision. Sherlock v. Berry, 487 So.2d at 558. Under these circumstances the trial court did not abuse its much discretion.
However, Alexander argues that the court erred by not awarding any future medical expenses. Considering the medical testimony as to future treatment, testing, and possible surgery, we find the court abused its discretion by not awarding future medical expenses. We amend the judgment to include $10,000 for such expenses.

HALL'S AWARD
Dr. Bogran testified he saw Mr. Hall two days after the accident. X-rays of the neck showed spasms of the musculature and the doctor told Hall not to work and recommended conservative treatment. By February 26, 1987 Hall complained of pain from the neck to the right arm. A CAT scan showed a herniated disk at C5-C6 and Dr. Bogran felt Hall also had minimal herniations at C3-4 and 5 levels and a possible herniated lumbar disk attributable to the accident. He referred Hall to Dr. Vogel.
Dr. Vogel testified that he saw Hall on May 5, 1987 and his impression was that he *669 probably had a herniated cervical disk. He reviewed a March 27, 1987 CAT scan which revealed a herniation to the right at C5-6 and a mild bulge at C6-7. Hall had a myelogram, another CAT scan and neurological examination. The CAT scan showed a mild disk herniation at 3-4 to the right, a minimal central posterior disk herniation at C4-5, and a large herniation at C5-6 with no abnormality at C6-7.
Hall underwent an anterior cervical fusion in which the disk herniation was removed, the nerve root decompressed, and the interspace fused with a small piece of bone from his pelvis. Conservative treatment was recommended and six weeks after the operation Hall reported moderate cervical and right shoulder pain. Two months after surgery he reported mild cervical and left shoulder pain. Dr. Vogel said Hall had a 10-15% impairment of the body. Although Dr. Vogel felt he could return to work, the doctor advised him to avoid lifting, pushing or pulling more than 50 pounds or repeatedly flexing his neck. Dr. Vogel said maximum improvement would occur one year after surgery.
On May 10, 1988 Hall complained of mild cervical pain plus severe lumbosacral and right leg pain. In June, 1988 a lumbosacral MRI revealed a mild posterior herniation at L5-S1. Dr. Vogel felt that Hall was experiencing a flare-up of that herniated lumbar disk.
Dr. Vogel said he was optimistic that Hall might not need surgery at all levels, C3-4, C4-5 and L5-S1 as the first two had not flared-up. Dr. Vogel stated that Hall would probably have a 10-20% pain residual on C5-6, the site of the fusion. The doctor was optimistic about the other disks. He attributed herniations in the cervical region and L5-S1 to the accident.
Dr. Kewalramani testified that he saw Hall on October 7, 1987. He had complaints of pain in the lumbar region and headaches. Hall complained of continuing pulling and pinching in the cervical region after the fusion in June, 1987. He experienced parethesis, tingling and numbness. Dr. Kewalramani concluded Hall had lumbar muscloligamentis pain syndrome with radiculopathy at the C6 level post operatively and C5, 6 and 7 (or one level up or down) and recommended conservative treatment.
On March 10, 1988 a CAT scan showed mild bulging of the disk at L5-S1 posteriorly. Thermography in July, 1988 indicated spasm and involvement of the motor fiber of L5 on the left side. Electromyography in August, 1988 showed S1 radiculopathy. A diskogram indicated a bulging disk at L5-S1 posteriorly to the longitudinal ligament. An MRI in June, 1988 indicated posterior bulging at L5-S1.
Dr. Kewalramani's final diagnosis was chronic cervical muscular pain syndrome with disk dysfunction. Level C5-6 had been fused; however, he found chronic lumbar pain syndrome and disk dysfunction at L5-S1. Dr. Kewalramani revised his first opinion due to the subsequent tests and opined Hall was a candidate for fusion at L4-5 and L5-S1. He testified that Hall will live in pain the rest of his life and would benefit from a pain clinic.
Dr. Kewalramani limited Hall to lifting 25 pounds regularly or 35 pounds maximum and he should not do overhead reaching, pushing or pulling. Dr. Kewalramani stated Hall's disability was 15% in the lumbar area, 20% anatomically or a whole body 35% permanent and partial disability of the body as a whole for the rest of his life unless he had another successful surgery. Dr. Kewalramani testified that Hall would have to take medication forever, need x-rays yearly and an EMG, nerve conduction study, CAT scan and MRI every two years, have lab work done yearly, see a neurosurgeon yearly (if there is deterioration), and a family physician every four to six weeks. He concluded there was a herniation at C5-6 and an ongoing degeneration in the cervical region at C4, 5 and 6 levels.
Dr. Levy conducted one examination of Hall on June 24, 1988 and his impression was that Hall had a disk removal and solid fusion of C5-6 which relieved his neck pain except on turning to the far right. He saw no residual signs of nerve root compression in the upper extremity and no objective nerve root compression in the lower back. *670 Dr. Levy concluded that Hall had a 5% permanent partial impairment of the body as a whole. Dr. Levy had reviewed only certain medical records. Because Hall did not complain of low back or lumbosacral pain until April, 1987, Dr. Levy did not attribute the low back problem to the accident. He felt Hall could work as a foreman dishwasher.
Bobby Roberts, a certified vocational evaluation specialist, testified that Hall scored below the third grade level on his tests. Roberts concluded that Hall was functionally illiterate, and that would correlate with the fact that Hall left school in the seventh grade at 17 years of age and had been in special education classes due to mental retardation. Roberts placed Hall's IQ score between 50 and 60 and said such individuals usually do unskilled work. Hall did not meet the sedentary criteria of work as defined by the Department of Labor. He could not even do light work.
Jennifer Palmer testified that Hall had been unemployed for two years prior to the accident, but had worked as a dishwasher supervisor at Antoine's restaurant. Hall had a ninth grade education and his job choices would be limited. She said a number of hotels always had such a job available. Dishwashing can be classified as light or medium work depending on what is required. She disagreed with Bobby Roberts' conclusions. She stated that even if Hall were classified illiterate, he would be able to work in similar jobs, but would be at a competitive disadvantage in the job market.
Susan Smith testified Hall was limited in his physical capabilities and should not push, pull, crouch or stoop for a long period of time. He can sit for only a short period of time. He should not lift overhead more than 10 pounds and should only laterally lift 25 pounds occasionally. He could not tolerate the standing necessary in a dishwashing job. Although Hall has a ninth grade education, he was below a first grade level in reading and would need to improve his reading and writing skills. The fact that another surgery was possible would cause job hunting problems and she recommended he be evaluated by a vocational rehabilationist.
Henry LaRoche testified that Hall had serious reading problems and was functionally illiterate. He testified that he contacted the hotels Ms. Palmer had stated had openings for dishwashers and found that she had not mentioned the possibility of a surgery in Hall's future. LaRoche felt that Hall was not employable.
Dr. Robert Vooght, rehabilation counselor, testified that he reviewed Hall's medical records and recommended a medical followup and counseling, occupational therapy, and pain management.
Dr. Wolfson testified that he used a 38 year life expectancy and a 28 year retirement figure and utilized Hall's salaries from 1981 through 1984 in his calculations. Hall's income had been limited in 1984 and there was none in 1985 or 1986. Determining a base salary by averaging 1981 through 1984 Dr. Wolfson arrived at $10,856 and calculated lost wages to be $13,235. If Hall could earn minimum wage, the figure would be $82,310. If Dr. Wolfson included 1985 and 1986 with no income, the average wage would have been $6,173 and there would be no future loss. He determined loss of future earning capacity to be $230,113.
Dr. Boudreaux assumed that Hall had earned $3,429 income in 1985 and $3,559 in 1986 (the amounts one could earn and not report) and calculated past wages to be $7,454. Assuming the 1985 and 1986 income was zero, he said the lost income would have been $6,394.32. Considering Hall was totally disabled, Dr. Boudreaux stated lost future earnings at $101,133. Using no income for 1985 and 1986 in his calculations, the figure would be $86,739. If he could work at minimum wage, using the higher wage rate Hall would have a $4,895$6,557 future loss. Using the lower figure for wages, he would have no loss.
Hall testified that he was in the back seat of the car when it hit the hole. He had both neck and back pain after the accident. Although he has a fusion in his neck, he continued to have pain.
The trial court's reasons for judgment note Hall was 33 years old when he *671 sustained a ruptured cervical disk and a ruptured lumbar disk in the accident. He had a surgical fusion and might need additional surgery along with medications and treatment. The court noted Dr. Vogel stated Hall had a 10-15% permanent partial total disability of his body. Dr. Kewalramani testified Hall sustained a 35% permanent partial total disability of his body. The court awarded $225,000 for general damages. We find the record supports that award. Although Hall argues it was too low, we cannot find that the trial court abused its discretion.
The trial court noted that Hall was unemployed at the time of his injury, but impairment of earning capacity is calculated on the plaintiff's ability to earn money. The court found that Hall sustained a future loss of earning capacity of $75,000 and awarded Hall special damages of $18,272 for medical expenses, lost wages of $13,199, and $15,000 for future medical expenses.
We conclude the trial court's awards are supported by the record. Although Hall argues that he should have received $36 more in lost wages and $109,874 more for lost earning capacity, we conclude the trial court did not abuse its discretion.

DAVIS' AWARD
Although the Sewerage and Water Board does not argue as to Davis' award of $3,325 including $325 for medical expenses, Davis in his answer submits that he should receive $825 for medical expenses. Exhibit P-39 clearly shows Davis' bill totals $825. We amend the judgment to reflect the correct amount.

CONCLUSION
We amend the judgment to award Raymond Davis $825 for past medical expenses and to award Anthony Alexander $10,000 for future medical expenses. As amended, the judgment is affirmed.
AFFIRMED AS AMENDED.