611 So.2d 841 (1992)
Paul MORTON
v.
Carl RAY and Eckerd Drugs.
No. 91-CA-2663.
Court of Appeal of Louisiana, Fourth Circuit.
December 29, 1992.
Rehearing Denied February 12, 1993.
*842 Robert J. Caluda, Betsy J. Barnes, Robert J. Caluda and Associates, New Orleans, for plaintiff/appellee.
C. William Bradley, Jr., Gerald J. Talbot, Kelley A. Robichaux, Lemle & Kelleher, New Orleans, for defendants/appellants.
Before BYRNES, CIACCIO and LANDRIEU, JJ.
LANDRIEU, Judge.
In this action for damages, the plaintiff, Paul Morton, his wife, and two minor children claim that defendant, Carl Ray, an employee of defendant Eckerd Drugs, negligently injured plaintiff's back. The defendants deny the allegations and alternatively argue that the awards are excessive. We amend in part, and as amended, affirm, affirm in part, and reverse in part.

FACTS
On March 21, 1988, at approximately 8:45 p.m., plaintiff, Paul Morton, was performing security services for defendant, Eckerd Drugs, within the course of his duties for Metro Security Consultants, his employer. Upon completing his round of counting the number of customers remaining in the store prior to closing, Morton was leaning against the metal railings separating the entrance and exit doors. Without warning, Carl Ray, an employee of Eckerd Drugs, playfully grabbed him on the shoulders from behind and pulled him backwards.
Morton had a pre-existing back condition that arose from injuries he sustained in a July 23, 1983 automobile accident. While employed as a street sweeper with the Louisiana Department of Transportation, he was rear-ended on Interstate-610. As a result of that accident, plaintiff suffered a ruptured disc. On December 7, 1984, his treating physician, Dr. Kenneth Adatto, performed surgery removing the ruptured disc at L4-5.
Although plaintiff continued to have back problems until the date of the incident in question, he resumed working and an active life approximately three years after the 1983 accident.[1] Frequently working 12 hour days, Morton had been working for Metro Security Consultants approximately *843 10 months before he was injured at Eckerd's.
At trial, Morton testified he was leaning against a rail in the front of the store when Carl Ray came up from behind him, grabbed him with both hands, and "snatched" him backwards. According to his testimony, when Ray "snatched" him backwards, his feet slipped and his back was pinned against the railing. As he attempted to pull himself forward, Ray was pulling him another way. Morton further testified that, prior to this incident, he had warned Ray not to pull on his shoulders, because his back was sensitive due to prior surgery.
Tammy Farria, an Eckerd Drug cashier, witnessed the incident. According to her deposition testimony, plaintiff was "sitting on the little security rails" when Ray came from behind plaintiff and said "boo". Simultaneously, Ray's hands grabbed Morton's shoulders in an attempt to scare Morton. Farria further testified that after Ray grabbed Morton, he "kind of went back but he didn't fall."
Carl Ray, manager of Eckerd Drugs, testified by deposition that while preparing to close the store, he saw Morton sitting on the railing that divides the entrance and exit doors. According to his testimony, he walked up to Morton, touched him on the arm, and said, "Hello, Paul." Ray further testified that he touched Morton on both shoulders with both hands. At that moment, plaintiff jumped off the railing and became hostile. He began using foul language, and threatened to beat Ray. At no time did he complain his back was hurting. Ray testified that after the incident the plaintiff approached him and stated that he was going to "sue the hell" out of him and Eckerd Drugs.
Lorraine Morton testified that, after her husband's accident, his personality changed a whole lot. He constantly yelled at their daughter, and on several occasions, he hit her. Mrs. Morton further testified that, prior to the accident, sexual activity was normal. After the accident, however, there was no sexual activity. Unable to tolerate Morton's mood swings and sudden outbursts brought on by the severe pain, Mrs. Morton and the children separated from plaintiff in May, 1990.
Dr. Kenneth Adatto testified by video deposition that when Morton complained in 1987 of spasm, numbness, and discomfort in his back, a CT scan and an MRI were ordered. In November 1987, results of these tests revealed both a recurrence of disc herniation at L4-5, the site of Morton's previous injury, and evidence of nerve compression. At this time, Dr. Adatto discussed with plaintiff the possibility of fusion surgery.
By January, 1988 Morton had learned to live with the problem. Dr. Adatto opined at this time that Morton did not need a fusion or subsequent surgery. Finally, Dr. Adatto testified that had there not been the accident on March 21, 1988, it is more probable than not that plaintiff would not have needed a disc fusion.[2]
Dr. James Butler, orthopedic surgeon, testified that, because of the March 21, 1988 accident, plaintiff's pre-existing condition became symptomatic and required that he perform a fusion and another laminectomy on the plaintiff in July, 1988. Dr. Butler further testified that because of this accident, Morton will have a 25% whole body physical impairment. Dr. Edmund C. Landry, Jr., orthopedic surgeon, opined that the March 21, 1988 incident caused plaintiff to start experiencing right leg pain and necessitated a fusion.
The jury returned a verdict in favor of all plaintiffs and against all defendants. Damages awarded to the plaintiffs are as follows:

*844
PAUL MORTON
Physical pain and suffering and emotional anguish, past, present, and
future. $350,000.00
Medical expenses, past, present, and future. $140,000.00
Loss of earnings and earning capacity. $177,000.00
LORRAINE MORTON (Wife)
Loss of consortium $100,000.00
PAULA MORTON (12 year old daughter)
Loss of consortium $ 75,000.00
JONATHAN MORTON (3 year old son)
Loss of consortium $ 50,000.00

DISCUSSION

CAUSATION
Defendants contend the jury committed manifest error when it determined Carl Ray's actions caused Paul Morton's injury. Specifically, defendants argue that Paul Morton's back problems were already present when the March 21, 1988 incident occurred.
The plaintiff has the burden of proving both his injuries and a causal connection between the injuries and the tort. McGrew v. Jordan, 516 So.2d 1246 (La. App. 2d Cir.1987). It is well settled in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Where defendant's negligent action aggravates a pre-existing injury or condition, he must compensate the victim for the full extent of his aggravation. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991).
After reviewing the record, we cannot say the trial court erred in determining Carl Ray's actions caused plaintiff's injuries. Accordingly, this assignment of error is without merit.

GENERAL DAMAGES
By this assignment of error, defendants contend the general damage award to Paul Morton is clearly excessive and should be reduced. The trial court awarded plaintiff $350,000 for physical pain and suffering and emotional anguish, past, present and future.
A trier of fact has much discretion in the assessment of general damages. La.Code Civ.Ann. art. 2324.1 (West Supp.1992). Before a Court of Appeal can disturb an award made by a trial court, the record must clearly reveal that trier of fact abused its discretion in making its award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. It is only after analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered excessive or insufficient. Reck v. Stevens, 373 So.2d 498 (La.1979).
After a determination of abuse has been made, the appellate court can disturb the award, but "only to the extent of lowering it (or raising it) to the highest (or lowest) amount which is reasonably within the discretion afforded that court." It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence. Coco v. Winston Industries, Inc., 341 So.2d at 335.
Similar cases in which the plaintiffs have sustained injuries comparable to those of Paul Morton have awarded general damages in the range of $100,000 to $250,000. *845 In Davis v. Sewerage and Water Bd., 555 So.2d 664 (La.App. 4th Cir.1989), writ denied 558 So.2d 603 (La.1990), four people were injured in an automobile accident. As a result of the accident, Anthony Alexander, the driver, suffered a herniated disc at the L5-S1 level. Dr. Vogel removed part of the disc which was compressing the nerve root. Plaintiff was diagnosed as having a 10-15% permanent partial total body medical impairment. This Court affirmed the award of $100,000 in general damages.
Maurice Hall, one of the three passengers in the automobile, suffered a herniated disc at C5-6, a mild disk herniation at C3-4, and a minimal central posterior disc herniation at C4-5. He underwent an anterior cervical fusion in which the disc herniation was removed, the nerve root decompressed, and the interspace fused with a small piece of bone from his pelvis. At trial, there was testimony that he may need further surgery, and he will live in pain for the rest of his life. He was diagnosed having a 20-30% permanent functional impairment. This Court affirmed an award of $225,000 in general damages.
The plaintiff in Lopez v. Chicago Bridge and Iron Co., 546 So.2d 291 (La.App. 3d Cir.1989), writ denied 551 So.2d 1323 (La. 1989), underwent a spinal fusion and was still unable to return to work at the time of trial. According to his orthopedic surgeon, he could only perform sedentary work and will probably be on pain medication for the rest of his life. The Third Circuit held the trial court's general damage award of $200,000 was not excessive.
This Court in Arruebarrena v. Boh Brothers Construction Co., Inc., 539 So.2d 78 (La.App. 4th Cir.1989), affirmed an award of $250,000 in general damages. Plaintiff, who had a prior lumbar laminectomy at disc L4-5, was reinjured in an auto accident. As a result of the accident, he suffered a herniated lumbar disc, nerve root compression, and a motor root involvement. According to his physician, a fusion was virtually inevitable.
In McLemore v. Fox, 565 So.2d 1031 (La.App. 3d Cir.1990), writ denied 569 So.2d 966 and 968 (La.1990), plaintiff was injured in an automobile accident. As a result of the accident, McLemore underwent three surgeries (a laminectomy at C3-7, a four level discectomy at C3-4, C4-5, C5-6 and C6-7 with anterior cervical interbody fusion and decompression of nerve roots bilaterally, and removal of hypertrophic spurs and discs at C2-3 plus fusion). Because of the severity of his injuries, the Third Circuit found McLemore's general damage award of $150,000 was an abuse of discretion and increased the award to $300,000, the lowest general damage award reasonably within the court's discretion for the injuries sustained by McLemore.
Considering Morton's history before and after the accident, we find plaintiff's general damage award of $350,000 excessive so as to constitute an abuse of discretion. Following Coco v. Winston Industries, Inc., we must decrease the award to an amount that is the maximum which would not constitute such abuse. Therefore, we reduce the general damage award to $250,000.

PAST AND FUTURE MEDICAL EXPENSES
In this assignment of error, defendants contend the $140,000 award for past, present and future medical expenses was an abuse of discretion. At the time of trial, Morton's medical expenses totalled $70,309.31. Included in these expenses were plaintiff's cost of surgery, medical treatment, medication, and psychiatric treatment for Morton's wife and daughter. Subtracting the difference from the jury award, the remaining $69,690.69 was to cover all future medical expensesorthopedic and psychiatric treatment plus all the medication for the rest of plaintiff's life approximately 30 years based on his life expectancy.
The Second Circuit, in Lloyd v. TG & Y Stores Co., 556 So.2d 629, 637 (La.App. 2d Cir.1990), held that
[a]n award for future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. However, like any other element of damages, future medical expenses must be established *846 with some degree of certainty. Awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable costs.
Defendants argue that Morton will need only an additional $10,000 for future medicals. Their calculation is based upon the following assumptions: (1) that the doctors could discontinue all of the medication plaintiff requires since the accident; (2) that Morton needs an orthopedic consultation only once a year; (3) that an orthopedic consultation will continue to cost only $45 per visit for the next 30 years; (4) that Morton needs only 17 one-hour psychiatric visits per year; and (5) that these psychiatric visits will continue to cost only $125 per visit for the next 30 years.
At trial, Dr. Landry testified that plaintiff needs periodic treatments either by an orthopedic surgeon or a neurosurgeon. Although there is a limit as to what can be done for Morton, Dr. Landry noted plaintiff could get worse and require hospitalization. Dr. Landry would not recommend future surgery. An operation to remove scar tissue from around the spine or disc would only cause more scar tissue to grow.
Dr. Oliver Sanders, Jr., plaintiff's treating psychiatrist, testified that plaintiff would require psychiatric treatment for the remainder of his life. This treatment will help him cope with the pain, anxiety, stress, and sleeping disorder.
Morton's psychiatric treatment alone, over three years, totaled $40,380. Considering the testimony of Morton's doctors that he will need treatment for the remainder of his life, we cannot say the trial court was clearly wrong in awarding plaintiff $70,000 for future medical expenses. Accordingly, this assignment of error is without merit.

LOSS OF EARNINGS AND EARNING CAPACITY
Defendants contend the jury award of $177,000 in loss of earnings and earning capacity for past, present and future earnings and earning capacity was an abuse of discretion.
Loss of future earnings is based on lost earning capacity. Such an award is not predicated solely upon the difference between a plaintiff's earnings before and after the accident. Rather, it encompasses the reduction in a person's ability to do that for which he is equipped by nature, training, and experience and for which he may receive recompense. Peterson v. Western World Ins. Co., 536 So.2d 639, 645 (La.App. 1st Cir.1988), writ denied 541 So.2d 858 (La.1989). Factors to be considered in determining such an award are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, and the inflation factor. Id.
Dr. Cornelius E. Gorman, provider of general rehabilitative services, evaluated plaintiff to determine if he could be placed in a job. According to his testimony, Morton was unemployable because of both his physical impairment and his emotional problems.
Dr. Seymour S. Goodman, plaintiff's expert in economics, testified that plaintiff's loss of earnings dating from March 21, 1988 through the date of the trial amounted to $25,391.87.[3] Based upon a 18.1 year work expectancy from date of trial, a wage increase of 7.21% per annum, and a discount rate of 7.875%, Dr. Goodman computed future loss of earning capacity to equal $151,905.05. Past and future earnings then totalled $177,297.82.
Dr. Kenneth Boudreaux, defendant's economist, was provided with Morton's May 12-December 7, 1986 earnings records from Flambeau's Flaming Chicken. Using a wage increase of 2.5-5.5% per annum, he estimated lost wages of $23,642. Based on a work life expectancy of 18.1 years from the date of the accident, Dr. Boudreaux computed future loss wages to range between *847 $96,079 and $119,390.[4] Total past and future loss of earnings, using a midpoint of $107,734, totalled $119,390.
After considering all of the factors, we cannot say the jury abused its discretion when it awarded Morton $177,000 for loss of earnings and earning capacity. Accordingly, this assignment of error is without merit.

LOSS OF CONSORTIUM
In this assignment of error, defendants contend the loss of consortium awards to Morton's wife and his two minor children is clearly excessive. The jury made the following awards for loss of consortium: Mrs. Lorraine Morton, $100,000; Paula Morton, $75,000; and Jonathan Morton, $50,000.
Compensable elements included in a loss of consortium claim include loss of service, love and affection, society and companionship, sexual relations, support, and felicity or overall contentment and happiness. Vaccaro v. Smith & Imports, Inc., 539 So.2d 989, 993 (La.App. 4th Cir.1989), writs denied 541 So.2d 1391 and 1392 (La. 1989).
Plaintiff cites Bergeron v. Blake Drilling & Workover Co., 599 So.2d 827 (La.App. 1st Cir.1992), in support of their award for loss of consortium. In Bergeron, there was a premature explosion of a perforation gun on a drilling rig. As a result of the explosion, Smith lost his right leg below the knee, a part of his little finger on his left hand, a large amount of soft tissue, bone, tendon and ligament from his left foot. Additionally, he had shrapnel lodged in his right eye and multiple shrapnel wounds to the front of his body and face. Smith spend forty-nine (49) days in the hospital and underwent nine surgical operations. Finding the loss of consortium awards to Mrs. Smith and the two minor Smith children was higher than any previously awarded in Louisiana, the First Circuit reduced Mrs. Smith's award to $100,000 and the two minor children's award to $35,000.
Cases in which plaintiffs have sustained injuries comparable to those of Morton have awarded $25,000 for loss of consortium. In Spangler v. North Star Drilling, Co., 552 So.2d 673 (La.App. 2d Cir.1989), plaintiff's husband injured his back on a drilling rig. As a result of the accident, he underwent two back surgeries, including a fusion. Plaintiff's injuries put a strain on their marriage, diminished their sex life, and caused him to become more irritable and frustrated. Sometimes he vented this frustration on his wife and child. Finding the trial court's award of $75,000 to plaintiff's wife for loss of consortium to be an abuse of discretion, the Second Circuit reduced the award to $25,000.
In Mercer v. Freheuf Corp., 492 So.2d 538 (La.App. 3d Cir.1986), writ denied 496 So.2d 350 (La.1986), plaintiff injured his back when he slipped and fell from the top of a trailer. As a result of the accident, Mercer underwent surgery. Prior to his surgery, plaintiff required his wife's assistance in almost every aspect of his daily life. After the surgery, his condition improved slightly, but deteriorated to the point of again requiring assistance. Noting the accident caused a significant change in the lifestyle of plaintiff's wife and his children, $25,000 for loss of consortium was found not to be excessive.
Considering the injury sustained by plaintiff, we find the trial court's loss of consortium award to Mrs. Morton is so excessive as to constitute an abuse of discretion. Therefore, we reduce the award to $35,000.

EXCEPTION OF PRESCRIPTION
In their last assignment of error, defendants contend the Morton children's loss of consortium claim had prescribed.
The accident occurred on March 21, 1988, and the original petition by Mr. Morton was filed on July 19, 1988. The supplemental and amended petition which added Mrs. Morton's loss of consortium claim was filed on December 12, 1988, within one year of the March 21, 1988 accident. However, the *848 supplemental and amended petition which added Paula and Jonathan Morton's loss of consortium claim was filed September 21, 1989, more than one year after the accident.
La.Code Civ.Proc. art. 1153 (West 1984) provides:
When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading.
The Louisiana Supreme Court, in Giroir v. South La. Medical Ctr., Etc., 475 So.2d 1040 (La.1985), held that a post-prescription amendment adding or substituting a plaintiff will relate back to the timely-filed original petition if:
(1) the amended claim arises out of the same conduct, transaction or occurrence set forth in the original pleading;
(2) the defendant either knew or should have known of the existence and the involvement of the new plaintiff;
(3) the new and old plaintiffs are sufficiently related so that the added or substituted party is not wholly new or unrelated;
(4) the defendant will not be prejudiced in preparing and conducting his defense.
In Poirier v. Browning Ferris Industries, 517 So.2d 998 (La.App. 3d Cir.1987), writ denied 519 So.2d 105 (La.1987), the Third Circuit held a post-prescription amendment adding a wife's claim for loss of consortium 22 months after the accident did not relate back to the timely filed petition of her husband. Applying the Giroir test, the court held that, although the wife's claim arose out of the same incident as the husband's claim, it was a separate cause of action. Nothing in the petition put the defendants on notice that the original plaintiff was married, much less that his wife may have an action for damages. The untimely filed claim caused prejudice to the defendants.
As in Poirier, Paula and Jonathan Morton's claim arises out of the same incident as their father's claim. However, it is a separate cause of action. Although defendants had knowledge that Morton had children, nothing in the supplemental and amended petition adding Mrs. Morton's loss of consortium claim put the defendants on notice that the Morton children may have a claim for damages. The consortium claims of the children were filed more than one year after the original petition was filed. To allow them to recover damages would prejudice the defendants.
Morton next argues that his children's loss of consortium claim did not arise on the date of the accident, but arose on the date they actually suffered the loss. Assuming the children's loss of consortium did not begin to run on the date of the incident, it would have begun to run when Morton had surgery in July, 1988. Since the supplemental and amended petition adding Paula and Jonathan's loss of consortium claim was filed more than a year after the surgery, their claim has still prescribed. Accordingly, this argument is without merit.
We find that plaintiffs have failed to satisfy prongs (2) and (4) of the Giroir test. Therefore, Paula and Jonathan Morton's loss of consortium claims have prescribed.
For the foregoing reasons, the judgment of the trial court is AMENDED to reduce the general damage award in favor of Paul Morton to $250,000 and the award in favor of Lorraine Morton to $35,000 and, as amended, the judgment is AFFIRMED. Paula and Jonathan Morton's award for loss of consortium is reversed, and all other awards for damage are affirmed.
AMENDED IN PART AND AS AMENDED, AFFIRMED; AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] When Morton first resumed work, he was employed by Flambeau's Flaming Chicken as a cook.
[2] As a result of the March 21, 1988 accident, Morton underwent a partial laminectomy at L4 and L5, removal of disc material at L5, and a fusion of L4 to the sacrum.
[3] Dr. Goodman took Morton's salary as it was in March 1988 and increased it yearly by 7.21%. This percentage increase is derived from government statistics for Louisiana security guards for the years 1959 through 1979.
[4] According to Dr. Boudreaux, the most recent tables of the Bureau of Labor Statistics indicate Morton's work life, as of the date of the accident, was 20.43 years. A little over three years have passed between the time of the accident and the time of trial.