622 So.2d 684 (1993)
Nancy M. BOURGEOIS,
v.
Marguerite B. McDONALD, M.D., Enrique Suarez, M.D., and the State of Louisiana through the Louisiana State University Medical Center.
No. 92-CA-2361.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1993.
Rehearing Denied September 15, 1993.
*686 Lawrence S. Kullman, Pierre G. Walker, III, Lewis & Kullman, New Orleans, for appellee.
Richard P. Ieyoub, Atty. Gen., Robert S. Leake, Asst. Atty. Gen., Baton Rouge, for appellant.
Before KLEES, BYRNES and WALTZER, JJ.
BYRNES, Judge.
Plaintiff-Appellee, Mrs. Bourgeois, underwent surgery in 1980 to remove cataracts. Thereafter she had to wear "thick" spectacles to correct her vision. Though the glasses were not attractive and produced distortion of peripheral vision, they provided good central vision and allowed Mrs. Bourgeois to lead a normal life.
She tried unsuccessfully in the years immediately following her cataract surgery to replace the "thick" glasses with contacts.
On January 4, 1984, Mrs. Bourgeois met with the defendant-appellant, Dr. Marguerite McDonald, to discuss a new procedure known as epikeratophakia by which a so-called "living lens", or epi lens, is sewn onto the cornea of the patient to improve vision, thereby eliminating the problem Mrs. Bourgeois was having keeping contacts in place.
Dr. McDonald told Mrs. Bourgeois that she was not a candidate for epikeratophakia. Dr. McDonald advised her that she should have two operations to place a plastic intraocular lens (IOL) in each eye, substituting for the lenses that had been removed in the cataract surgeries.
It was Mrs. Bourgeois' understanding that she was to have one eye operation, go home, and if that surgery went well, she would return after a period of time to have the other eye operation. Mrs. Bourgeois testified without contradiction that she is a widow with no family to turn to and that it would be very difficult for her to take care of herself if both eyes were incapacitated by simultaneous operations.
On January 24, 1984 surgery was performed by Dr. McDonald on Mrs. Bourgeois to insert an intraocular lens in the left eye.
In connection with that surgery Mrs. Bourgeois signed only a general consent form. The only risks described were contained in the following pre-printed boiler plate form which on its face bears little relationship to the surgery to which Mrs. Bourgeois was consenting:
Some risks known to be associated with this procedure, including anesthesia, are death, brain damage, quadriplegia (paralysis of all arms and legs), paraplegia (paralysis of both legs), loss of organ, loss of arm or leg, loss of function of organ, loss of function of an arm or leg, and disfiguring scars.
No mention is made of eyes or visual impairments. This non-case specific boiler plate form is virtually identical to that found to be inadequate in Hondroulis v. Schumacher, 546 So.2d 466 (La.1989). It is not sufficient to qualify for the presumption of consent provided by LSA-R.S. 40:1299.40. There can be no presumption of consent where the consent form makes no mention of the risk at issue.
*687 The day after the first operation Dr. McDonald came to Mrs. Bourgeois' hospital room and, contrary to previous discussions, told her that on the following day she intended to perform the "epi" on the right eye.
Mrs. Bourgeois protested that she did not wish to have the second operation so soon after the first. However, Dr. McDonald convinced her that she should proceed with the operation promptly, and that her convalescence would be brief. In connection with the second operation Mrs. Bourgeois signed two consent forms. She testified that she could not see what she was signing because of her surgery on the previous day. One was on the same pre-printed form Mrs. Bourgeois had signed in connection with the first operation. The other was more specific. That form contained the following relevant language:
I understand and the physicians have explained to me, that the visual correction of my aphakia with glasses, intraocular lenses or contact lenses would not be satisfactory. Cataract glasses produce disabling distortions, intraocular lenses have a significant incidence of complications and contact lenses cannot be used by everybody. I understand that I am being asked to enter into a study evaluating a new surgical method for correcting my vision.
* * * * * *
I am aware that the correction obtained may not be perfect, and that an additional correction with glasses may be needed. I also understand that the possibility exists that the donor cornea may have to be removed if a significant distortion in vision is produced, but the top layer of my cornea will regrow.
As this form also fails to address the risk of virtual blindness which befell Mrs. Bourgeois, it also fails to qualify for the presumption of consent provided by LSA-R.S. 40:1299.40.
After the operations Mrs. Bourgeois was legally blind. She never recovered vision in her left eye.
Because of complications with the epi, Dr. McDonald performed additional surgeries on Mrs. Bourgeois' right eye on April 6, 1984 and May 17, 1984.
After eleven months of unsatisfactory results Mrs. Bourgeois went to Dr. McDonald in December of 1984 seeking help because she still could not see. Mrs. Bourgeois testified that Dr. McDonald told her that only a psychiatrist could give her vision, i.e., her problems were psychosomatic. Dr. McDonald did not offer to remove the epi from the right eye and never again saw or communicated with Mrs. Bourgeois.
In 1986 Dr. Azar changed the IOL in Mrs. Bourgeois' left eye to one that was more flexible. Although her vision did not improve, the pain she had experienced in the left eye was eliminated.
On July 13, 1991, Dr. Miles Friedlander removed the epi lens from Mrs. Bourgeois' right eye. One month later he implanted an intraocular lens in the right eye based on newer technology which was unavailable at the time Dr. McDonald operated and thereby restored her vision to a satisfactory level. Thereafter Mrs. Bourgeois was able to resume normal activities.
Mrs. Bourgeois filed suit against Dr. McDonald, Dr. Enrique Suarez, and the State of Louisiana through the Louisiana State University Medical Center, contending that the physicians had deviated from the proper standard of care in performing elective bilateral eye surgeries only two days apart and that they had not obtained her informed consent to do the procedures. Dr. Suarez was ultimately dismissed from the proceedings. At trial, the jury found no fault in the operations performed by Dr. McDonald.[1] The jury did find that defendants *688 failed to properly inform the plaintiff of the risks of the operations and awarded damages. The defendants appealed from this judgment, and the plaintiff answered the appeal on the issue of the damages awarded.

The Failure To Include The "Objective Standard Of Causation" In A Jury Interrogatory Was Not Error
In Hondroulis v. Schumacher, 546 So.2d 466, 470 (La.1989) the court established an "objective standard of causation":
"Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in plaintiff's position would have consented to the treatment or procedure had the material information or risks been disclosed. (Emphasis added)
The Court's instructions on the question of consent were lengthy and thorough. As may be seen by reference to the following excerpts from the instructions to the jury the court made reference to the reasonable person/patient standard at least seven times:
... [T]he responsibility to inform the patient of the dangers present in proposed treatment and the disclosure of any material consequences which could influence the decision of a reasonable person in the patient's condition to decide whether to consent to an operation or not.
* * * * * *
A physician's failure to disclose a possible danger is not a breach of duty on her part in the absence of a showing that a reasonable person's consent would have been withheld if she had been informed of the danger.
* * * * * *
Under our law, a risk is material when a reasonable person in what the physician knows or should know to be the patient's position would be likely to attach significance ot the risk or cluster of risks in deciding whether or not to forego the proposed treatment or operation.
* * * * * *
Whether a reasonable person in the patient's position probably would attach significance ot the specific risk is a question of fact that you must decide from the evidence.
* * * * * *
Louisiana law provides that if a patient is proved to have signed a consent form, then that patient is presumed to have understood and consented to encounter such risks set forth in the consent form and the patient can only disprove this presumption by showing that her consent was induced by misrepresentation or inadequate disclosure.
A physician's duty to disclose material information, including reasonable alternative therapy, must be communicated in terms that a reasonable doctor would believe a reasonable patient in Mrs. Bourgeois' position would understand. Technical language should not be used to inform an untutored lay person and in order for a reasonable patient to have awareness of a risk.
* * * * * *
If you find from a preponderance of the evidence that Dr. McDonald did not properly obtain Mrs. Bourgeois' informed consent to one or both of the procedures performed in January of 1984, that there was a causal relationship between the Doctor's failure to disclose material information and the alleged harm suffered by the plaintiff and that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure had the material information and risk been disclosed, then you may hold Dr. McDonald responsible for whatever damages Mrs. Bourgeois suffered from that risk. (Emphasis added)
The instructions to the jury were completely adequate. Additional references to the reasonable person/patient standard in the jury interrogatories are not required under the circumstances. Cangelosi v. Our Lady of the Lake Regional Medical *689 Center, 564 So.2d 654, 668 (La.1990) is inapposite. In Cangelosi the issue was the failure of the trial court to include an essential jury instruction. In the instant case the trial court issued the required jury instruction in the form quoted above. The trial court was not required to repeat the substance of that instruction in its interrogatories to the jury, and its failure to do so was not error.

It Was Not Error To Allow Mrs. Bourgeois To Testify That She Would Not Have Consented To The Surgery If She Had Been Properly Informed
Hondroulis v. Schumacher, 546 So.2d 466, 470 (La.1989) is inapposite. It is true that Hondroulis establishes the objective standard as discussed above. But there is nothing in Hondroulis to suggest that the plaintiff should not be allowed to testify as to what she would or would not have done had she been properly informed. A showing that a reasonable patient would not have consented to the operation had she been properly informed is not all there is to this issue. Although plaintiff cannot prevail if it can be shown that a reasonable patient would have consented to the operation if fully informed of the risks, the converse is not necessarily true. Proving that a reasonable patient would not have consented if fully informed is not enough if it could also be proved that this particular plaintiff would have consented regardless. Plaintiff's testimony is relevant on this issue. If it could be proved that Mrs. Bourgeois would have consented even if she had been fully informed of the medical risks, then she could not be heard to complain about lack of informed consent. It was not error to allow her to testify on this issue. Additionally, her testimony on the issue was inextricably interwoven with her testimony concerning the whole issue of informed consent and should be viewed as a whole.

The Court Did Not Err In Allowing The Testimony of Janet Herke Ferran
Ms. Ferran, an ophthalmological technician at LSU Eye Center testified on behalf of the plaintiff. Ms. Ferran briefly stated that Dr. McDonald had sent her a letter asking her to comment on Mrs. Bourgeois' abnormal behavior in the clinic. Ms. Ferran refused. She felt that the behavior was not abnormal. She felt that Mrs. Bourgeois was just expressing her distress about her loss of vision. But defendants complain that Ms. Ferran's testimony regarding the letter from Dr. McDonald was irrelevant because Mrs. Bourgeois' mental condition had nothing to do with the issues in the case, i.e., whether Dr. McDonald exercised the proper standard of care and whether Dr. McDonald failed to disclose material medical risks. Ms. Ferran's testimony was relevant to the issue of Mrs. Bourgeois' mental anguish and Dr. McDonald's credibility.
Defendants also complain that the testimony was prejudicial because it implied that Dr. McDonald tried to pressure Ms. Ferran into fabricating a statement about Mrs. Bourgeois' mental condition. If there was any such implication in Ms. Ferran's testimony, it was elicited by the persistence of the defendants in dwelling on the issue in the course of defendants' cross-examination of Ms. Ferran. Defendants cannot now complain about testimony that they themselves elicited.
The trial court is granted a great deal of discretion in assessing the probative value of evidence. City of Baton Rouge v. Tullier, 401 So.2d 422 (La.App. 1 Cir.1981). In the absence of a clear abuse of that discretion the ruling of the trial court will not be reversed on appeal. Ketcher v. Illinois Central Gulf R. Co., 440 So.2d 805 (La.App. 1 Cir.1983). Any legally competent evidence which when taken alone or in connection with other evidence, tends to prove or disprove the material or controlling issue, or tends to defeat the rights asserted by one or the other of the parties or sheds any light upon or touches the issues in such a way as to enable the jury to draw a logical and reasonable inference with respect to the matter or principal fact in issue, is relevant. Dean v. Nunez, 534 So.2d 1282, 1289 (La.Ap. 4 Cir.1988). The testimony of Ms. Ferran was neither irrelevant *690 nor prejudicial. It was within the broad discretion of the trial court to allow such evidence.

Causation
Defendants argue that Mrs. Bourgeois failed to prove that the risk of which she was not informed caused her eye problems. There was conflicting testimony on this issue. What the defendants are really arguing is that there is another way of looking at the evidence on causation, which is to say that on the issue of causation we are dealing with disputed issues of fact. The jury disagreed with the defendants on this issue. In the absence of manifest error we are bound by such findings, and we find no manifest error. Anglin v. White, 572 So.2d 779 (La.App. 4 Cir.1990). Although the defendants would have this court adopt their view of the evidence, there was sufficient evidence to support the findings of the jury to the contrary. Where there are two permissible views of the evidence, the fact finder's choice cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Defendants argue that because plaintiff's self-serving testimony cannot be used to establish the "objective standard" of informed consent, that her testimony on causation, also being self-serving, should be excluded. The Supreme Court in Hondroulis does not say that. It is one thing to say that courts should not allow a litigant to establish subjective standards that conveniently fit the needs of her case. The logical conclusion of defendant's argument is that we should admit no testimony from any person who has an interest in the outcome of the litigation. This is clearly not workable. In many cases the litigants themselves may be the only ones who have any knowledge of the facts. Defendants' argument is a two edged sword. Is not the defendants' testimony just as likely to have been prejudiced by self interest? It is the function of the trier of fact to determine to what extent self-interest has colored a witness' testimony.[2] On appeal it is the function of this court to sustain those determinations in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). We find no such error in the explicit or implicit findings of the jury on this issue.
Defendants assert that "... the only risk that came to pass was that the epi might have to be `peeled off if over time it proved to be unsatisfactory." Mrs. Bourgeois acknowledged more than once that she had been advised of this possibility. Therefore, defendants argue that Mrs. Bourgeois should be denied all damages associated with the right eye, especially medical expenses.
The jury must have found that the risk of peeling off the epi was not the only risk associated with the right eye. There was also the risk of virtual blindness in the right eye. The jury must have concluded that Mrs. Bourgeois was not properly informed of that risk; and that a reasonable person if properly informed of that risk would not have agreed to the operation on the right eye had that reasonable person been in Mrs. Bourgeois' position. Such findings by the jury are not manifestly erroneous, nor clearly wrong. The jury was entitled to believe Mrs. Bourgeois when she testified that she had good central vision in both eyes after her earlier cataract surgery; that the loss of peripheral vision associated with such surgery was only the normal inconvenience shared by all who underwent such surgery; that she was able to lead a normal life; and it was not such a debilitating handicap that one would risk blindness to correct it. The jury was entitled to believe Mrs. Bourgeois when she testified that she was not spectacle intolerant, and that she did not feel compelled to undergo these two operations if she wished to have functional vision. It was not manifest error for the jury to conclude that a properly informed reasonable person would not have consented to the operation on the second (right) eye, at the risk of giving up acceptable central vision in both eyes in *691 exchange for blindness in both eyes just on the hope of getting improved peripheral vision; and glasses that were less bulky; that the consent forms were not adequate; and that the oral explanations did not sufficiently supplement the consent forms.
The issue of informed consent in this case is remarkably like that in Hondroulis v. Schumacher, 612 So.2d 859 (La.App. 4 Cir.1992) where this court noted at p. 862 that:
... [T]he [trial] court stated that Mrs. Hondroulis was not adequately informed either because Dr. Schumacher did not make the required disclosures, that the disclosure made by him was made in a language not understood by Mrs. Hondroulis, or that Mrs. Hondroulis' condition at the time the disclosure was made precluded comprehension of the disclosure.
Mrs. Bourgeois' testimony that she was in no condition to read or understand the two consent forms for the second eye operation she signed on the day after the first operation would have allowed the jury to draw the same conclusions on the issue of informed consent that were drawn by this court in the language quoted above from the Hondroulis case. The jury was not clearly wrong in rejecting the defendants' evidence that the consent forms were adequately supplemented orally.
As we stated previously, the consent forms in this case were inadequate to create the presumption of consent provided by LSA-R.S. 40:1299.40. Regardless, there was sufficient evidence in the record to have allowed the jury to have overcome such a presumption had defendant been entitled to it.
As this court noted in the Hondroulis case at 612 So.2d 861:
"Generally speaking, the presumption of informed consent may be rebutted by proving the following:
1). There is a material risk which the physician has a duty to disclose.
2). The physician failed to inform the patient about a material risk.
3). The material risk was realized.
4). There is a causal connection between the failure to inform the patient of the risk and realization of the risk.
There is sufficient evidence in the record to support affirmative findings on all four of these criteria. Therefore, it was not error for the jury to find that Mrs. Bourgeois' consent to the eye operations was not properly obtained; and that she was entitled to medical expenses and damages arising out of those operations.

Past Physical Pain and Suffering
The jury awarded nothing for past physical pain and suffering. (In her answer to this appeal plaintiff does not contest the jury's decision not to award damages for future pain and suffering.) In reviewing Mrs. Bourgeois' testimony it is understandable that the jury focused on past mental and emotional pain and suffering for which it awarded $100,000 and loss of enjoyment of life's pleasures or inconveniences for which it awarded $75,000. She described in some detail her fears of being alone, helplessly and hopelessly blind, with no family to turn to as well as the loss of many activities that she enjoyed. The picture that she painted of her miserable life as a legally blind recluse was vivid. Contrariwise, her testimony concerning pain and suffering was sparse and lacked detail. The only severe pain she complained of was in connection with an outpatient procedure to "relax" her epi. There is no indication that pain lasted any longer than the procedure. It was, perhaps, only a brief sharp pain. Other than an occasional oblique reference to pain, Mrs. Bourgeois never complained about how the pain affected her. She never said that she required any pain medication, not even aspirin. Not all operations involve great pain and suffering. The jury must have concluded that her real injuries were those for which they compensated her, and that her complaints of physical pain and suffering were really not significant. This is one of those questions of fact that falls into the special province of the jury. Where there is competent evidence in the record to support the finding of the jury it cannot be manifestly erroneous. *692 As indicated the record almost completely supports the jury's conclusionalmost. However, it is manifestly erroneous/clearly wrong to suggest that Mrs. Bourgeois endured no compensable physical pain and suffering. After all she went through, such a conclusion is just not reasonable. In view of the dearth of testimony on Mrs. Bourgeois' physical pain and suffering we are bound to respect the finding of the jury to the extent possible. Although any award we make must be minimal, we feel compelled to make some award for physical pain and suffering. Recompense for pain and suffering cannot be calculated with precision. Davis v. Sewerage and Water Bd. of New Orleans, 555 So.2d 664 (La.App. 4 Cir.1989), writ denied 558 So.2d 603 (La.1990). Therefore, we award Mrs. Bourgeois the sum of $2,500 for past physical pain and suffering.
The jury awarded Mrs. Bourgeois medical expenses in connection with subsequent surgeries performed on her eyes by Dr. Azar and Dr. Friedlander in order to rectify problems that arose in connection with the procedures performed earlier by Dr. McDonald. Therefore, the jury must have concluded that those later procedures were the necessary consequence of, i.e., caused by, Dr. McDonald's operations for which informed consent was not properly obtained from Mrs. Bourgeois. Since Mrs. Bourgeois' "uninformed" consent to the earlier procedures was causally connected to the later procedures, defendants are liable to Mrs. Bourgeois for any physical pain and suffering she experienced in connection with the subsequent operations performed by Dr. Azar and Dr. Friedlander. Elliott v. Robinson, 612 So.2d 996, 1006 (La.App. 2 Cir.1993).
However, Mrs. Bourgeois did not state that she experienced any physical pain in connection with the procedure performed by Dr. Azar on the left eye. She testified that she had pain in that eye when she went to see him, but when he operated the "pain disappeared immediately. There was never a pain again...." As this is the only testimony on this issue in the record, we have no basis for awarding Mrs. Bourgeois damages for physical pain and suffering in connection with this procedure.
In 1991 Mrs. Bourgeois testified that Dr. Friedlander performed two operations on her right eye:
On July 15th he peeled the EPI, the "living lens" from my eye and I went home.
* * * * * *
After the month, I had seemed to heal very well, so he said he believed I was ready for a lens inside.
* * * * * *
... [Y]ou're looking at a miracle, because when Dr. Friedlander put that lens in my eye, it was like a light went on and I could see everything.
Mrs. Bourgeois' testimony contains no reference, explicit or implicit, to any physical pain or even discomfort experienced in connection with the operations performed by Dr. Friedlander. Therefore we find no basis for awarding damages to Mrs. Bourgeois for physical pain and suffering in connection with the two operations performed by Dr. Friedlander. As stated previously, not all operations necessarily cause pain and suffering.

Plaintiff's Economic Loss
Plaintiff asserts that "... the trial court decided that the issue of the plaintiff's economic loss would not be submitted to the jury because the plaintiff had not presented any expert testimony on this issue." (Emphasis added)
What the trial judge actually said was:
"With respect to Larry's objections to loss of earning capacity, it is the Court's belief that he did not present sufficient information to allow the jury to make some reasonable determination. No experts were called. No information was given other than the self-serving testimony of his client with respect to her salary and no other information." (Emphasis added)
Thus the basis for the trial court's position was the complete lack of what the trial *693 court considered probative evidence on the issue of earnings. The judge did not state that expert testimony was a sine qua non for proving loss of earnings. He merely posited it as an example of a type of evidence that might have probative value.
There are many types of evidence ranging from documentary in the form of pay stubs and tax returns to oral testimony, including her own that plaintiff could have produced to prove her earning capacity. Mrs. Bourgeois' own testimony included no reference to what she was earning, if anything, for the two or three years immediately preceding the operations performed by Dr. McDonald.
The plaintiff testified that she intends to return to work now that the vision in her right eye has been restored and is correctable to 20/20. She makes no claim for loss of future earnings. However, at the time of trial she had not returned to work and submitted no evidence of current earning capacity.
If a party does not object to the failure of the court to submit an issue of fact to the jury, that objection is waived. LSA-C.C.P. art. 1812. In this case, however, the plaintiff objected to the refusal of the trial court to submit the issue of lost wages to the jury. Regardless of how this action may have been characterized by the trial court, the substance and effect of it was a directed verdict against the plaintiff on the issue of lost earnings.
A directed verdict may not be granted by the trial court, ex proprio motu, but may only be granted on the motion of one of the litigants. Scholegel v. Robinson, 416 So.2d 366, 368 (La.App. 4 Cir. 1982); Pete v. New Orleans Public Service, Inc., 402 So.2d 807, 808 (La.App. 4 Cir.1981).
No such motion was made by any of the litigants on the issue of lost earnings. The only motion for a directed verdict was made by counsel for the defendants when the plaintiff rested her case:
Your Honor, at this time the Defense would move for a directed verdict on the issue of deviation from the standard of care relating to the performance of the bilateral eye surgery two days apart. (Emphasis added)
This motion was denied. Defendants reargued this motion on the same grounds at the conclusion of their case. It was again denied. A motion for a directed verdict shall state the specific grounds therefore. LSA-C.C.P. art. 1810. Defendants did not raise the issue of loss of earnings in their motions for a directed verdict. The trial court did so on its own. That was error. Had the defendants moved for a directed verdict on this issue, they would clearly have been entitled to it. Plaintiff was not prejudiced. Therefore, we find it was harmless error as the plaintiff failed to discharge her burden of proof on this issue.
Accordingly, the judgment of the trial court is affirmed but the judgment is amended to include an additional award of $2,500 for past physical pain and suffering, bringing the total damage award to $201,355.76.
AFFIRMED IN PART; AMENDED IN PART.
NOTES
[1] The record indicates that Dr. McDonald is a pioneer in her field with a highly respected national reputation. Dr. Azar, plaintiff's expert, testified that:

A. There was nothing wrong with the lens [it was the best available at the time] nor the technique Dr. McDonald used to insert that lens.
Q. So you have no criticism whatsoever of Dr. McDonald or the work she did or lens she chose in conjunction with your replacement?
A. That's correct.
[2] The trial court specifically instructed the jury that "... when you weigh the credibility of a witness, you should consider the interest, if any, which he or she may have in the outcome of the case."