780 So.2d 1265 (2001)
Wayne ARDOIN, et ux
v.
Dr. Scott MILLS, et al.
No. 00-1257.
Court of Appeal of Louisiana, Third Circuit.
March 8, 2001.
*1266 John E. Bergstedt, The Bergstedt Law Firm, Lake Charles, LA, Counsel for Dr. Scott Mills and LA. Medical Mutual Insurance Co.
Richard B. Cappel, Raggio, Cappel, etc., Lake Charles, LA, Counsel for St. Paul Fire & Marine Insurance Co. and Dr. David Drez.
Robert W. Clements, Stockwell, Sievert, Viccellio, Lake Charles, LA, Counsel for Lake Charles Memorial Hospital.
R. Joshua Koch Jr., Spyridon, Koch, Wallace, Metairie, LA, Counsel for Wayne Ardoin and Betty Ardoin.
Benjamin Joseph Guilbeau, Stockwell, Sievert, Viccellio, Lake Charles, LA, Counsel for Lake Charles Memorial Hospital.
Court composed of DOUCET, Chief Judge, PETERS and AMY, Judges.
AMY, Judge.
The plaintiff filed suit against his treating orthopedic surgeon and the radiologist who performed an arthrogram for diagnostic purposes. He alleged that the radiologist and the hospital at which the arthrogram was performed breached the applicable standard of care in that the sterile field during the procedure was not maintained. This breach, he alleges, resulted in a shoulder infection that ultimately led to a shoulder fusion. He also argued that the orthopedic surgeon breached the standard of care in failing to timely diagnose the infection. A jury found in favor of the defendants. The plaintiff appeals. For the following reasons, we affirm.

Factual and Procedural Background
The plaintiff, Wayne Ardoin, began suffering right shoulder pain and sought treatment from a chiropractor and then, a family practitioner who made a diagnosis of calcific tendinitis and administered an injection of cortisone. The plaintiff then sought treatment from Dr. David Drez, an orthopedic surgeon. Dr. Drez began treating the plaintiff in early June 1995. Although physical therapy was recommended and provided some relief, the plaintiff again experienced an onset of pain later in the month. Dr. Drez administered another injection and, when the symptoms did not improve, referred him to Dr. Scott Mills, a radiologist, for an arthrogram.[1] According to Dr. Drez, this invasive, diagnostic procedure, was prescribed in order to determine whether the plaintiff had a rotator cuff tear.
The procedure was performed by Dr. Mills at Lake Charles Memorial Hospital (LCMH) on June 30, 1995. During the procedure the plaintiff complained of pain. On subsequent treatment from Dr. Drez, the plaintiff indicated that he was experiencing a different type of pain than prior to the arthrogram. The pain did not cease and, eventually, Dr. Drez ordered a CT scan. According to Dr. Drez, the scan, which was also performed by Dr. Mills, revealed "calcific tendinitis and marked degenerative changes in the glenohumeral joint." Dr. Drez then referred the plaintiff to Dr. Charles A. Rockwood, Jr., an orthopedic surgeon in San Antonio, Texas. When the plaintiff saw Dr. Rockwood on August 21, 1995, Dr. Rockwood's test also revealed degenerative changes, changes that could be caused by infection. Cultures taken from the area indicated the presence of staphylococcus aureus and gammella morbillium. Due to the infection, Dr. Rockwood performed an arthrodesis, fusing the joint solid. Following this procedure, the plaintiff returned to *1267 Dr. Drez's care. He underwent subsequent procedures to remove screws and a plate from the area. Due to the arthrodesis, the plaintiff's use of his arm is now restricted.
The plaintiff commenced proceedings under the Louisiana Medical Malpractice Act, La.R.S. 40:1244.41, et seq., against Dr. Drez, Dr. Mills, and LCMH. The Medical Review Panel found in favor of the health care providers, finding that the evidence presented was insufficient to demonstrate that the applicable standards of care were not met. On September 23, 1997, the plaintiff filed the instant matter, asserting that Dr. Mills was negligent in performing the arthrogram which resulted in the alleged infection. Similarly, the plaintiff claimed that LCMH breached its applicable duty by failing to provide a sterile environment for the procedure. Finally, the plaintiff argued that Dr. Drez was liable for negligently failing to diagnose the infection in a timely matter. In addition to the damages sought by Mr. Ardoin, his wife, Betty Ardoin, sought damages for loss of consortium. At the close of the plaintiffs case at trial, LCMH filed a motion for directed verdict regarding its liability. It was granted by the trial judge and proceedings resumed against the remaining defendants. The jury returned a verdict in favor of the defendants finding that neither of the physicians breached the applicable standard of care.
The plaintiff appeals,[2] assigning the following as error:
A. The trial court erred by allowing the introduction into evidence of the medical review panel opinion.
B. The trial court erred by failing to find, as a matter of law, that Dr. Scott Mills breached his standard of care by failing to obtain Wayne Ardoin's informed consent to the arthrogram procedure.
C. The trial court erred by including in its jury charge that a "rare or remote risk need not be disclosed" to the patient.
D. The trial court erred in failing to charge the jury that Louisiana law requires that reasonable alternatives to the proposed method of treatment or procedure be disclosed to the patient prior to the procedure.
E. The trial court erred in allowing the incompetent testimony of Dr. Javier Tello into evidence.

Discussion

Introduction of the Opinion of the Medical Review Panel
Prior to trial, the plaintiff filed a Motion in Limine in an attempt to prohibit the introduction of the opinion of the Medical Review Panel. As he does here, the plaintiff pointed out that the panel was composed of two radiologists and one orthopedic surgeon. He contends that the depositions of the two radiologists revealed that they deferred to the opinion of the orthopedic surgeon member as to whether Dr. Drez breached the applicable standard of care. Similarly, the orthopedic surgeon on the panel also testified that he deferred to the opinion of the radiologists with regard to whether Dr. Mills satisfied the standard of care owed. According to the plaintiff's argument, the opinion of the panel is misleading as it represents that it is the opinion of the entire panel. The trial court denied the motion in limine finding that the statute regarding the composition of the Medical Review Panel clearly anticipates this situation. The plaintiff contests this determination and argues that the opinion was not relevant and the members not competent to render an opinion as to a field outside *1268 their area of expertise. Like the trial court, we find the statutory scheme clearly provides for the introduction of the opinion in this instance.
With regard to the composition of a Medical Review Panel, La.R.S. 40:1299.47(C)(3) provides:
(f) The qualification and selection of physician members of the medical review panel shall be as follows:
(i) All physicians who hold a license to practice medicine in the state of Louisiana and who are engaged in the active practice of medicine in this state, whether in the teaching profession or otherwise, shall be available for selection.
(ii) Each party to the action shall have the right to select one physician and upon selection the physician shall be required to serve.
(iii) When there are multiple plaintiffs or defendants, there shall be only one physician selected per side. The plaintiff, whether single or multiple, shall have the right to select one physician, and the defendant, whether single or multiple, shall have the right to select one physician.
. . . .
(v) If there is only one party defendant which is not a hospital, community blood center, tissue bank, or ambulance service, all panelists except the attorney shall be from the same class and specialty of practice of health care provider as the defendant. If there is only one party defendant which is a hospital, community blood center, tissue bank, or ambulance service, all panelists except the attorney shall be physicians. If there are claims against multiple defendants, one or more of whom are health care providers other than a hospital, community blood center, tissue bank, or ambulance service, the panelists selected in accordance with this Subsection may also be selected from health care providers who are from the same class and specialty of practice of health care providers as are any of the defendants other than a hospital, community blood center, tissue bank, or ambulance service.

(Emphasis added.)
Thus, the composition complained of by the plaintiff, is specifically permitted by the statutory scheme of the Medical Malpractice Act. Furthermore, the opinion rendered by the panel, is admissible pursuant to the mandatory language contained in Subsection (H) which provides:
Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. If called, the witness shall be required to appear and testify....
(Emphasis added.) Thus, the combination of the statutory provisions provides that the fields of the members of the Medical Review Panel may reflect the fields of the health care providers before it and that the opinion rendered by that panel shall be admissible. Accordingly, the trial court did not err in determining that the opinion was properly admissible. Furthermore, the plaintiff had the opportunity to call the members of the panel, question them as to the opinion rendered by the panel, and question them as to their own areas of expertise. At that time, the jury was free to afford the weight it saw fit to the opinion. This assignment lacks merit.

Informed Consent
In his next assignment of error, the plaintiff contends that the jury erred in failing to find that, as a matter of law, Dr. Mills breached the standard of care as he failed to disclose that the arthrogram carried a risk, not only of infection, but that he could lose the use of his arm due to such an infection. He contends that, if he had been apprised of this risk, he would not have undergone the procedure. Furthermore, he contends that Dr. Mills *1269 should have informed him that reasonable alternatives to the invasive arthrogram existed, namely an MRI.
With regard to the necessity for a patient's informed consent, La.R.S. 40:1299.40 now provides:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
Commenting upon the concept of informed consent, the Louisiana Supreme Court has stated:
The doctor's duty is to disclose all risks which are "material" .... In broad outline, a risk is material when a reasonable person in what the doctor knows or should know to be the patient's position would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.
The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is great.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
Hondroulis v. Schuhmacher, 553 So.2d 398, 411-12 (La.1988)(on rehearing) (citations omitted). See also Lugenbuhl v. Dowling, 96-1575 (La.10/10/97); 701 So.2d 447.
In the present case, it is uncontested that the plaintiff executed a consent form prior to the arthrogram. The form, admitted into evidence and signed by the plaintiff, states, in part:
A physician has adequately explained to me the nature, purpose and effect of the above described operation, treatment, or diagnostic procedure, and the alternatives, the possibility of risks and complications, as well as the chances of success. I am aware that the practice of medicine and surgery is not an exact science, and I acknowledge that no guarantees have been made to me as to the results of the operation or procedure.[3] *1270 Here, the plaintiff asserts that he executed the form after Nurse JoAnn Thibodeaux explained the arthrogram procedure to him immediately prior to Dr. Mills entering the procedure room. He contends that neither Thibodeaux nor Dr. Mills explained to him the risks attendant to the procedure. The plaintiff testified that, had he been aware that he might lose the function of his arm, he would not have undergone the procedure. Dr. Mills, however, testified that he informed the plaintiff of the risks involved, namely, bleeding, infection, and allergic reaction. Dr. Mills stated that these are the material risks of the procedure. He argues that the standard of care did not require that he then explain the potential complications of these risks, i.e., the potential that infection could lead to the loss of the use of his arm.
It is this further risk that the plaintiff contends was necessary to satisfy the standard of care. We disagree that the jury was required to find that the potential of loss of function of the arm was a material risk of the operation. The jury repeatedly heard expert testimony indicating that the physician is expected to reveal material risks of the operation, but not every potential complication. Furthermore, expert testimony was presented indicating that an infection of this type is very rare. As can be seen from the supreme court's discussion in Hondroulis, the nature of the risk and the likelihood of its occurrence are important to determine whether a risk is material.
As for the plaintiff's contention that the jury erred in failing to find a breach of the standard of care due to any failure of Dr. Mills to apprize him that an MRI was an alternative to the more invasive arthrogram procedure, we find this to be without merit as well. As pointed out in the plaintiff's brief, the supreme court has indicated that alternative methods of treatment may be important to considerations of whether there has been informed consent. In Hondroulis, 553 So.2d at 411, the court stated:
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternative methods of treatment.

(Citations omitted.)
Here, the jury heard testimony from both Dr. Drez and Dr. Mills, that at the time of the 1995 procedure, the arthrogram was the "gold standard" for diagnosing a torn rotator cuff. Dr. Drez informed the jury that he felt the arthrogram was the preferable diagnostic tool for the plaintiff's potential problem. Dr. Drez specifically testified:
At that stage in our diagnostic workup of patients with possible rotator cuff pathology an arthrogram was the standard of care. We had not developed enough expertise in the use of MRIs in 1995 to warrant them being used because of the cost and because of our inability to utilize them to the degree that they should be. They were an evolving technology at that time.
The jury was presented with all of this testimony and was free to conclude whether the availability of the MRI, or lack thereof, was necessary in order for the plaintiff to have made an informed decision. Obviously, it concluded that it was not. We do not find that the evidence regarding the merits of the MRI was such that the jury was required to find it was an alternative of which the plaintiff had to be informed.
Accordingly, the plaintiff's arguments regarding the informed consent doctrine are without merit.

*1271 Jury Instructions

Next, the plaintiff argues that the trial court erred in instructing the jury that a rare and remote risk need not be disclosed to a patient. Notwithstanding our statement above regarding the necessity of disclosing "material risks" to a patient, we point out that even an erroneous instruction, alone, does not warrant a reversal.
La.Code Civ.P. art. 1792(B) provides that "[a]fter the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them." In Lee v. Automotive Cas. Ins. Co., 96-517, p. 3 (La.App. 3 Cir. 11/6/96); 682 So.2d 995, 997, writ denied, 96-2949 (La.1/31/97); 687 So.2d 409, a panel of this court explained:
The trial court is under no obligation to give any specific jury instructions that may be submitted by either party; it must, however, correctly charge the jury. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3 Cir.1991). Jury instructions are adequate if they fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3 Cir.1981). "An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial." Doyle, 576 So.2d at 1152. This manifest error standard of review may not be ignored unless the proposed jury instructions are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts. Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267 (La.App. 3 Cir.1989).
Having reviewed the closing instructions here, we find no such error.
This assignment lacks merit.

Dr. Javier Tello's Testimony
In presenting his case, the plaintiff attempted to demonstrate that the technician assisting Dr. Mills was coughing/sneezing through the arthrogram procedure and that organisms from this resulted in the infection. In particular, he pointed out that cultures taken from the infected area established the presence of staphylococcus aureus and gamella morbillum. The plaintiff asserted that the much more rare organism, gamella morbillum, can colonize in the upper respiratory tract, thus, showing that the infection suffered by the plaintiff could have been caused by coughing and sneezing in the area.
In his final assignment, the plaintiff contests the introduction of the deposition testimony of Dr. Javier Tello, a specialist in infectious diseases. He contends that Dr. Tello's opinion regarding the possibility that gamella morbillorum can colonize on the skin and that this condition could have been what caused the infection could not satisfy the requirements of the analysis set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[4]
La.Code Evid. art. 702 provides as follows with regard to the introduction of expert witness testimony:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Daubert, 509 U.S. 579, 113 S.Ct. 2786, the United States Supreme Court considered FED.R.EVID. 702, which is mirrored by La.Code Evid. art. 702, and discussed the trial court's role as a gatekeeper in its consideration of whether scientific *1272 testimony is not only relevant, but reliable. The Court stated that the trial court's consideration "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93, 113 S.Ct. at 2796. Some factors bearing on this analysis are whether: 1) A theory or technique can be or has been tested; 2) It has been subjected to peer review or has been published; 3) There is a high known or potential rate of error; 4) There are standards controlling the technique's operation and; 5) The theory enjoys general acceptance in the relevant scientific community. Id. As explained both in Daubert, and the Court's subsequent opinion in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), this inquiry is a flexible one and the factors mentioned above are not to be considered a checklist or test. In State v. Foret, 628 So.2d 1116, 1123 (La.1993), the Louisiana Supreme Court observed the similarity between the federal and Louisiana rules regarding the admissibility of expert testimony and went on to "adopt Daubert's requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702."
In the present case, we find no error in a determination that Dr. Tello's testimony satisfies both questions of relevancy and reliability. The deposition testimony reveals that Dr. Tello is an internist and a specialist in infectious disease. In his memorandum in support of the motion in limine, the plaintiff referenced Dr. Tello's position that gamella morbillorum can be found on the skin and that it may have survived the attempts to sterilize the plaintiff's shoulder, thus causing the infection. The plaintiff contends the memorandum that "Dr. Tello is simply not qualified to state that the organism `gamella morbilorum' is found on skin, a necessary predicate to his opinion." Specifically, the plaintiff argues:
Dr. Tello, who was unable to identify any instance during his entire practice that the negligence of a doctor or nurse caused an infection, relies exclusively for his opinion on a single article in a single test which does not ever mention by name the specific organism at issue. Indeed, when presented with several articles from authenticated and recognized medical journals which specifically address gammella morbillorum, Dr. Tello admitted that they did not so much as mention the skin as a possible site of colonization for this particular organism, but rather identified gamella morbillum as being located in the mouth, gastrointestinal tract and genitourinary tract.
(Footnotes omitted.)
We are aware that Dr. Tello's opinion, particularly that regarding possible areas of colonization for gamella morbillum, differed from that advanced by the texts produced by the plaintiff, but this difference of opinion, does not defeat its admission. Indeed, it stands to reason that contested expert testimony will be contradictory to that offered by the opposing party. The trial court must consider the reliability of the scientific testimony offered by the particular expert in question. Here, Dr. Tello identified himself as board certified in internal medicine and infectious diseases. He spoke extensively regarding the possibility of infection during an arthrogram, colonization of organisms on the skin, in particular in hair follicles, as well as their ability to withstand sterilization. Rather than gamella morbillorum, he opined that staphyloccocus aureus is the "culprit" in this type of infection. He stated that: "Gamella morbillorum may be a contaminant, maybe causing infection is possible. But I will say that Staphylococcus aureus is by far the most common agent for this type of infection."
That portion of Dr. Tello's deposition specifically objected to by the plaintiff was testimony related to the gamella morbillorum's ability to colonize on the skin. Dr. Tello testified that he obtained this information *1273 from a text book on infectious diseases, GERALD L. MANDELL, PRINCIPALS AND PRACTICES OF INFECTIOUS DISEASES, (4th Edition). He stated that, in the text, gamella morbillorum is mentioned in a group of bacteria that can be found in those areas of the body as urged by the plaintiff, but that it can also be found on the skin.
As explained above, the possibility of gamella morbillorum's presence on the skin is only one small portion of Dr. Tello's testimony. Considering this portion of his testimony in context, and in light of the flexible Daubert analysis, we find no error in the trial court's denial of the motion in limine. In short, this testimony regarding gamella morbillorum came from a specialist in the field of infectious diseases, involved an unquestionably rare pathogen, and was based on information contained in a published medical textbook. While certainly possible that some scientific testimony may be more perfectly tailored to fit the specific factors set forth in Daubert as considerations for reliability, we are mindful that the considerations are flexible and not intended to be applied in the rigid, checklist fashion, the plaintiff asks the trial court and this court to employ.
This assignment lacks merit.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Lake Charles Memorial Hospital's request for damages related to frivolous appeal is denied. All costs of this review are assigned to the plaintiffs, Wayne and Betty Ardoin.
AFFIRMED.
NOTES
[1] Dr. Mills' testimony indicates that the arthrogram as an x-ray procedure, requiring the anesthetization of the area and insertion of a needle into the shoulder joint and injection of dye.
[2] The plaintiff's appeal was originally taken against the two physicians and LCMH. As previously stated, a directed verdict was entered in favor of LCMH at the close of the plaintiff's case. Due to this verdict, LCMH filed an answer to the appeal, requesting attorney's fees and costs for frivolous appeal. Subsequently, the appeal against LCMH was dismissed.
[3] Additionally, the form is signed by Dr. Mills following the physician's statement which provides:

I have sufficiently explained to the person who signed this Consent the nature, purpose, and intended effect of the operation, treatment, or diagnostic procedure above described. I have answered any and all questions that have been raised to the patient's complete satisfaction. I have obtained his/her consent.
[4] The record indicates that a motion in limine in this regard was filed prior to trial. While the trial court's denial of the motion is evidenced by minutes of the proceeding, the record is without benefit of a judgment in that regard or transcript of the proceeding.